## No. 26001

Miller Bros, Inc. and the Contract Carriers' Conference of the Colorado Motor Carriers Association v. The Public Utilities Commission of the State of Colorado and Edwin R. Lundborg, Howard S. Bjelland, and Henry E. Zarlengo as the individual members thereof, Trans-Western Express, Ltd. as successor to Denver-Laramie-Walden Truck Line, Inc. and Denver-Loveland Transportation, Inc.; and Overland Motor Express, Inc., d/b/a Boulder-Denver Truck Line and Edson Express, Inc. and the Regular Route Common Carriers' Conference of the Colorado Motor Carriers Association

## No. 26002

Trans-Western Express, Ltd. as Successor in Interest to Denver-Laramie-Walden Truck Line, Inc., and Denver Loveland Transportation, Inc. v. The Public Utilities Commission of the State of Colorado and Edwin R. Lundborg, Howard S. Bjelland, and Henry E. Zarlengo, as the individual members thereof

(525 P.2d 443)

Decided July 29, 1974. Opinion modified and as modified rehearing denied September 3, 1974.

418

Stockton and Lewis, John H. Lewis, Ernest Porter, for plaintiff-appellant in No. 26001 and defendant-cross appellant in No. 26002 Miller Bros., Inc.

John P. Moore, Attorney General, John E. Bush, Deputy, Irvin M. Kent, Assistant, Eugene C. Cavaliere, Assistant, for defendant-appellee in No. 26001 and defendant-appellee in No. 26002 The Public Utilities Commission of the State of Colorado.

John P. Thompson, for defendant-appellees and cross-appellant in No. 26001 Trans-Western Express, Ltd. and Overland Motor Express, Inc. d/b/a Boulder-Denver Truck Line, and of defendant and cross-appellant Edson Express, Inc. and for plaintiff-appellant in No. 26002 Trans-Western Express, Ltd. as Successor in Interest to Denver-Laramie-Walden Truck Line, Inc., and Denver Loveland Transportation, Inc.

Jones, Meiklejohn, Kehl & Lyons, Thomas J. Burke, Jr.,

Edward Thomas Lyons, Jr., for defendants and cross-appellants in No. 26001 and No. 26002 The Regular Route Common Carriers Conference of the Colorado Motor Carriers Association.

John J. Conway, amicus curiae in No. 26001 and 26002.

MR. JUSTICE GROVES delivered the opinion of the Court.

These two cases were consolidated for oral argument. Case No. 26001 is called the Complaint Case and 26002 is called the Certificate Case. The Complaint Case arose when four common carriers filed a complaint against Miller Bros., Inc. before the Public Utilities Commission, alleging that Miller Bros. was acting as a common carrier, but had only contract carrier authority. The P.U.C. found that Miller Bros. was in fact operating as a common carrier under the guise of contract carrier authority. It issued a cease and desist order. This order was affirmed by the district court.

Miller Bros. held common carrier authority between Denver and Estes Park. The Commission ruled that this authority did not constitute authority to serve intermediate points. This portion of the decision was reversed by the district court.

In the Complaint Case we affirm the district court.

In the Certificate Case Miller Bros. applied for common carrier authority to serve substantially the same areas as were being served under its contract carrier authority. The application was granted in large part. The district court affirmed the Commission's grant of authority, as do we.

Contemporaneously with the announcement of this opinion, we are announcing *D & G Sanitation, Inc. v. P.U.C.,* 185 Colo. 386, 525 P.2d 455, and the consolidated cases of *Red Ball Motor Freight, Inc. v. P.U.C.,* and *Thacker Bros. Transportation, Inc. v. P.U.C.,* 185 Colo. 438, 525 P.2d 439. In

all of these cases, there is involved the construction of 1967 Perm. Supp., C.R.S. 1963, 115-9-5(2), commonly referred to as S.B. 208. We use the instant opinion as the bellwether of the three opinions.

Before considering the facts and issues in these two cases, we will discuss a portion of the development of common and contract carrier regulation in Colorado, and comment upon its current status. The original Public Utilities Act of 1913 contained no provisions relating to certificates of public convenience and necessity. Colo. Sess. Laws 1913, ch. 127. Provision for such a certificate was made in 1917 (Colo. Sess. Laws 1917, ch. 110, § 35) and the Commission began to issue certificates to motor vehicle carriers. In the meantime the General Assembly provided, in effect, that the only "automobiles" under the jurisdiction of the Commission would be common carriers. Colo. Sess. Laws 1915, ch. 133, § 1; 1921 Compiled Laws, ch. 46, § 2914; 1935 C.S.A., ch. 137, § 4; C.R.S. '53, 115-9-2. This concept was made more concrete as to "motor vehicle carriers" in Colo. Sess. Laws 1927, ch. 134, § 1(d).

Article XXV was added to our Colorado Constitution in 1954. It reads:

"In addition to the powers now vested in the General Assembly of the State of Colorado, all power to regulate the facilities, service and rates and charges therefor, including facilities and service and rates and charges therefor within home rule cities and home rule towns, of every corporation, individual, or association of individuals, wheresoever situate or operating within the State of Colorado, whether within or without a home rule city or home rule town, as a public utility, as presently or as may hereafter be defined as a public utility by the laws of the State of Colorado, is hereby vested in such agency of the State of Colorado as the General Assembly shall by law designate.

"Until such time as the General Assembly may otherwise designate, said authority shall be vested in the Public Utilities Commission of the State of Colorado; provided however, nothing herein shall affect the power of municipalities to

exercise reasonable police and licensing powers, nor their power to grant franchises; and provided, further, that nothing herein shall be construed to apply to municipally owned utilities."

The General Assembly has declared that a "common carrier" is a "public utility." 1969 Perm. Supp., C.R.S. 1963, 115-1-2(5) and C.R.S. 1963, 115-9-2. However, contract carriage has not been so declared. Thus, the Commission's authority over common carriers stems from both the constitution and the statutes, while its authority with respect to contract motor carriers is solely statutory. C.R.S. 1963, 115-11-1 *et. seq.* and amendments.

Neither the General Assembly nor the Commission has precisely defined contract carriage. *See* 1967 Report of the Public Utilities Commission to the Legislative Study Committee.

"Common carrier" means and includes
"every person, directly or indirectly affording a means of transportation, or any service or facility in connection therewith, within this state by railroad, motor vehicle, aircraft, or other vehicle whatever, by indiscriminately accepting and carrying, for compensation, passengers or property between fixed points or over established routes or otherwise . . . ." 1969 Perm. Supp., C.R.S. 1963, 115-1-2(5).

The statute also provides that the " '[c]ontract carrier by motor vehicle' " shall mean and include
"every corporation, person, firm, and association of persons, lessee, trustee, or any receiver or trustee appointed by any court, other than motor vehicle carriers as defined by subsection (4) of section 115-9-1, as amended, owning, controlling, operating, or managing any motor vehicle in the business of transporting persons or property of others or of transporting ashes, trash, waste, rubbish, and garbage to and from disposal cites, for compensation or hire over any public highway of this state between fixed points or over established routes, or otherwise, by special contract or otherwise." 1969 Perm. Supp., C.R.S. 1963, 115-11-1.

The last cited section of the statute further provides:

"(2)(a) Contract carriers by motor vehicle are divided into two classes for the purpose of this article, which shall be as follows:

"(b) Class A contract carriers shall embrace all contract carriers by motor vehicle operating over substantially regular or established routes or between substantially fixed termini; or to a fixed terminus or termini;

"(c) Class B contract carriers shall embrace all contract carriers by motor vehicle which do not operate over substantially regular or established routes or between substantially fixed termini."

While the definition of contract carriage has never been clarified by legislation or the Commission, there is general agreement as to certain contract carriage characteristics: (1) a contract carrier cannot serve the general public; (2) a contract carrier cannot participate in the formal rate-making process of the Commission; and (3) a contract carrier cannot interline. "Interlining" is a practice occurring when a carrier's certificated route does not reach the point of origin and the carrier receives a shipment from another carrier, or a practice whereby a carrier, whose certificated routes do not reach the shipment destination, transfers the shipment to another carrier for delivery. *Gilbertville Trucking Co. v. United States,* 371 U.S. 115, 83 S.Ct. 217, 9 L.Ed.2d 177 (1962). Also, a contract carrier may not "advertise in any newspaper, magazine, or other publication, or otherwise hold himself out to serve the public indiscriminately." Rule 17, Rules and Regulations Governing Contract Carriers by Motor Vehicle of the Public Utilities Commission of the State of Colorado.

Apart from any direct statutory expression, the Commission and the courts of this state established a monopolistic system of common motor carrier transportation. Under this policy of regulated monopoly, additional common carrier authority was not granted where adequate service was already being rendered. *Public Utilities Commission v. Weicker,* 168 Colo. 339, 451 P.2d 448 (1969).

"This Court has consistently held that the policy of the State

of Colorado and the whole theory upon which the structure of Public Utility Commission power is based is that of regulated monopoly. *Archibald v. Public Util. Comm'n.,* 115 Colo. 190, 171 P.(2d) 421; *Denver & R.G.W. R.R. v. Public Util. Comm'n.,* 142 Colo. 400, 351 P.(2d) 278. In accordance with this theory of regulated monopoly, we have held that a common carrier serving a particular area is entitled to protection against competition so long as the offered service is adequate to satisfy the needs of the area, and no finding of public convenience and necessity for common carrier service is justified unless present service offered in the area is inadequate. *Denver & R.G.W. R.R. v. Public Util. Comm'n,* supra; *Public Util. Comm'n v. Donohue,* 138 Colo. 492, 335 P.(2d) 285." *Ephraim Freightways, Inc. v. P.U.C.,* 151 Colo. 596, 380 P.2d 228 (1963).

The first installment of the Commission's 1967 report to the Legislative Study Committee stated:

"[A] monopolistic system of common motor carrier transportation developed in the State of Colorado insofar as scheduled line-haul common carrier operations were concerned. The Commission simply did not grant additional certificates where adequate service was already being rendered.

"The American economy, however, seeks competition. Competition had been suppressed by the Commission insofar as allowing scheduled line-haul common carriers to compete, in that the Commission has refused under existing law, to grant more than one line-haul certificate authorizing service between any two given points. The contract carriers, operating under very loose and general and comprehensive permits, issued from the period between 1931 and 1935, moved into this void and started rendering service. As a result we now have, in effect, a competitive contract carrier transportation system operating in the State of Colorado as well as in the common carrier system. The preceding discussion applies primarily to the scheduled line-haul common carrier operating over fixed routes between fixed termini, on the one hand, and on the other, the so-called 'A' permit contract carriers

who likewise operate over fixed routes between fixed termini and, for all practical purposes, on schedules.

"These competitive systems have now reached a point where they are in constant conflict . . . . Resolution of the problems cannot be avoided.

"The Committee may wish to consider this problem and may further wish to consider possible legislative solutions." Report of the Public Utilities Commission to the Legislative Study Committee, June 2, 1967, p. 84.

Prior to 1967, C.R.S. 1963, 115-9-5 read as follows:

"The commission shall have power, under such rules of procedure governing the application therefor as it may prescribe, to issue a certificate of public convenience and necessity to a motor vehicle carrier or to issue it for the partial exercise only of the privilege sought; and may attach to the exercise of the rights granted by said certificate such terms and conditions as, in its judgment, the public convenience and necessity may require."

In 1967 the General Assembly added the following to the statute by S.B. 208:

"The granting of any certificate of public convenience and necessity to operate a motor vehicle for hire, for the transportation of property, shall not be deemed to be an exclusive grant or monopoly, and the doctrine of regulated competition shall prevail. The commission shall have authority to grant more than one certificate of public convenience and necessity to operate motor vehicles for the transportation of property over and along the same route or a part thereof or within the same territory or a part thereof, if the commission finds that the present or future public convenience and necessity requires or will require such operation." 1967 Perm. Supp., C.R.S. 1963. 115-9-5(2).

Now for the first time we interpret this amendment.

## THE COMPLAINT CASE

### I.

As mentioned, four common carriers complained that Miller Bros. was operating as a common carrier when it had

only contract carrier authority. After a hearing, the Commission made the following findings:

A. That Miller Bros. placed an advertisement in the Official Motor Freight Guide, a magazine distributed to shippers, identifying the points which it served;

B. That Miller Bros. had interlined with other carriers;

C. That under its contract carrier permit, Miller Bros. was indiscriminately accepting, discharging and laying down freight, and was holding itself out to the general public to serve as a common carrier.

The Commission ordered Miller Bros. to cease and desist from operating as a common carrier under its contract carrier authority.

Miller Bros. has argued that the Commission's findings of fact lack the requisite specificity. The Commission made 20 separate findings, approximately half of which concerned Miller Bros.' operations. It appears that much of the conduct considered by the Commission would not support the conclusion that Miller Bros. was acting as a common carrier. The Commission did not specify which of the findings supported that conclusion. Miller Bros. has also contended that the P.U.C. should have designated specifically the acts prohibited by the cease and desist order. This P.U.C. decision is not a model of clarity. There was evidence, however, to support the three findings set forth above, and these findings do in fact support the conclusion that Miller Bros. was acting as a common carrier.

The Contract Carriers' Conference characterizes the unlawful acts of Miller Bros. as minimal. This may be true. The P.U.C. did not revoke Miller Bros.' contract carrier authority as it was requested to do, and one reason for this may have been that the Commission also regarded these acts as minimal. In any event, the Commission's quoted findings and its conclusion are amply supported by evidence in the record.

The Contract Carriers' Conference also argues that certain conduct of Miller Bros. specified in findings not quoted above is not prohibited to a contract carrier. Assuming

*arguendo* that the Conference is correct in this argument, our decision would not thereby be changed.

The effect of our decision in the Certificate Case renders the issues as to the cease and desist order largely, if not entirely, moot.

## II.

Miller Bros. held Certificate No. 2251 under which the Commission had granted common carrier authority. This authority permitted the transportation of freight over the following routes:

1. Denver to Estes Park via Longmont, Lyons and either North or South St. Vrain, and return;

2. Boulder to Estes Park via Lyons, and either North or South St. Vrain, and return;

The certificate also described other routes with the added phrase "and between intermediate points," such as:

"Denver to Estes Park via Boulder and Lyons and return, either North or South St. Vrain, and between intermediate points."

The certificate was issued in 1926 after a hearing at which witnesses from Longmont testified in favor of its issuance. In the decision authorizing the granting of the certificate, the Commission stated that the petition for the authority was "to operate certain *lines* of transportation" and that public convenience and necessity required the operation of a "motor *transportation system.*" (Emphasis added.)

The Commission held that Miller Bros. has "no authority to operate as a common carrier under P.U.C. No. 2251 between Denver and Longmont and intermediate points." The district court reversed, holding that the certificate permitted service to named fixed points, such as Longmont and Lyons. The court stated:

"This Court concludes that the described routes between Denver and Estes through Longmont and other fixed points are statutory words of authority. That the fixed points describing the routes between Denver and Estes are words of art that need no further definition or clarification.

"When an established route is described by fixed points, as in this case, Denver to Estes via Longmont and other named

fixed points, the established route is more than a described passageway between Denver and Estes. The established route is a grant by the Commission of statutory authority to serve the public on that route.

"The granting of 'intermediate service' to a fixed point on the established route is in no way a limitation or exclusion of authority to serve the public over the entire route. In fact, if anything, it is a grant of additional authority for that fixed point."

The court also approved the dissenting opinion of the Commission. The following is found in this dissent:

" 'It is clear from the words referred to by the Commission that what was applied for was not authority to transport commodities only originating and terminating in Denver and in Estes Park, but that what was being sought and granted was the right to operate a *line* or *system of transportation* along such routes; that the transportation system desired to be operated was a system serving along the routes designated, which routes extended and were limited by the point, Denver, and the point, Estes Park, and passing through Longmont and other "via" points stated. The word "between" refers to a *space* encompassed by two points, which space the applicants in said proceeding desired to serve and which space was located along the described route between Denver and Estes Park.

" 'Effect should also be given to the fact that in its STATEMENT the Commission states that the petitioner filed its petition to operate lines for the transportation of passengers, etc. "between certain *points* designated in the application . . ." and to the fact that Longmont, among others, is a point designated in the application.' "

■ It is argued that the language "and between intermediate points" used in some of the described routes in effect excluded such authority in those routes whose description did not include such language. This apparently was the view of the majority of the Commission. We are cognizant of the guidelines set forth in *McKenna v. Nigro*, 150 Colo. 335, 372 P.2d 744 (1962):

"Great weight must be given to the interpretation which the

Commission gives to its own language, and unless such interpretation is clearly erroneous, arbitrary or in excess of its jurisdiction, the courts may not interfere."

We feel, however, that for the reasons articulated in the quoted portion of the dissenting opinion of the Commission and the quoted portion of the district court's opinion, the ruling of the Commission majority was clearly erroneous.

We might add to the reasons set forth in the dissent and the district court opinion that, if service could not be rendered at intermediate points, there was no need to designate the routes to be followed between the ultimate terminals. As a matter of fact, in its findings in the Certificate Case, the Commission stated: "In view of the fact that this certificate will authorize service between fixed points with no service to intermediate points, there is no necessity to designate routes to be used . . . ."

## THE CERTIFICATE CASE

On June 6, 1969, Miller Bros. applied to the Commission for a common carrier certificate of·public convenience and necessity in lieu of its existing contract carrier permit. The contract carrier permit was No. A-455 involved in Case No. 26001. Generally, it authorized Miller Bros. to transport freight between Denver and the northern Colorado points of Longmont, Loveland, Fort Collins and Greeley, and also to transport freight between several of these and other points in the same general area. The filing of this application for a common carrier certificate followed the hearings in the Complaint Case and preceded the announcement in that case of the recommended decision, which later became the final decision of the Commission. Five common carriers protested the application. Three of the protestants are not involved in this appeal. The other two have merged to become Trans-Western Express, Ltd. (TWX). TWX had a monopoly on regularly scheduled intrastate common carrier service between Denver and Fort Collins and between Denver and Loveland. TWX and one other carrier were the only regularly scheduled intrastate common carriers operating between Denver and Greeley.

Following approximately thirteen days of hearings, during which 157 customers testified in support of Miller Bros.' application, a P.U.C. hearing examiner recommended that the application be denied in its entirety. The Commission (by a 2-1 majority) reversed in large part, granting common carrier authority to serve between Denver and a 5-mile radius on the one hand and, on the other, Greeley and a 2-mile radius, Fort Collins and a 2-mile radius, and Loveland. It cancelled all of Miller Bros.' contract carrier authority under A-445, except as to Denver-Longmont and intermediate points, and as to the latter limited the authority to serve only fifteen customers.

The district court generally affirmed.

The 15-customer limitation as to the Denver-Longmont authority has become moot under our opinion in the Complaint Case. We reverse as to the cancellation of the contract authority not coextensive with the common carrier authority granted by the Commission, and affirm the remainder of the judgment.

## III.

TWX has protested vigorously that Miller Bros. is unfit financially and otherwise to be granted either common or contract carrier authority. In this connection the Commission found:

"Miller Bros., Inc., either as a corporation or as a partnership, has operated as a common carrier in Colorado for almost 20 years and as a contract carrier for some 35 years. Miller Bros., Inc., is adequately financed and staffed with competent personnel. It has adequate equipment and adequate facilities to provide adequate common carrier services on the routes and to the points for which it seeks certification. The stability of the operation is attested to by the long period of time during which it has provided motor carrier freight service in the State of Colorado. It is completely qualified and fit to render the common carrier service for which it seeks certification."

This is the type of issue which is particularly within expertise unique to the Commission. Unless the findings of

the P.U.C. are unsupported by competent evidence or are arbitrary and capricious, we should and do not interfere. Here there is such an abundance of evidence to support the findings that there is no need to further set forth the arguments or detail the evidence.

IV.

This brings us to the primary issue: How should S.B. 208 be interpreted?

Prior to the enactment of S.B. 208, it had long been Commission and Court-made law in Colorado that *regulated monopoly* was the state policy in the field of certificates of public convenience and necessity. *Colorado Transportation Co. v. P.U.C.,* 158 Colo. 136, 405 P.2d 682 (1965), and cases cited therein. Under this concept an applicant for a competing certificate was obliged to show "substantial" inadequacy in existing service. *Ephraim Freightways, Inc. v. P.U.C.,* 151 Colo. 596, 380 P.2d 228 (1963).

As already noted, S.B. 208 provides that the grant of a certificate of public convenience and necessity should not be deemed an exclusive monopoly, and that the doctrine of regulated competition shall prevail. The Commission has been given authority to issue more than one certificate for the same route, or portion thereof, if it finds that the present or future public convenience and necessity requires or will require such operation.

TWX argues that S.B. 208 is void because it fails to define "regulated competition" and because it contains no standards or criteria under which the Commission can determine when an additional competitive certificate should be granted or denied. Therefore, TWX contends we must apply "traditional standards," *i.e.,* the requirement of showing an inadequacy of existing services.

TWX further maintains that, even overlooking the lack of definition of "regulated competition," the Commission has not used or even proposed any standards or criteria to apply the "regulated competition" doctrine; and a court may not invade the legislative province by establishing such standards.

■ We hold that the statute and the Commission's action are valid.

We cannot subscribe to the view that S.B. 208 is void because the legislature did not define the term "regulated competition" and that, therefore, there is no doctrine of regulated competition. The term appears perfectly plain and understandable. No one complains about the comprehensibility of the term "regulated monopoly," and counsel for TWX appears to understand it very well. To us, one phrase is just as meaningful as the other.

It is true that the legislature prescribed no standards or criteria under which an additional competitive certificate may be granted or reviewed. We need not and do not reach the question of whether, absent constitutional authority in the Commission, the legislative delegation to the Commission is invalid for failure to prescribe guidelines. This is so because *Colo. Const. Art.* XXV has granted to the Commission authority to issue certificates of public convenience and necessity. *Seltzer v. Commissioners of Land Office,* Okla., 258 P.2d 1172 (1953), is a case very much in point. This is a legislative function (*In Re Application of Shanks,* 173 Neb. 829, 115 N.W.2d 441 (1962)) and, until the General Assembly restricts it, the Commission has as much authority as the legislature possessed prior to the adoption of Article XXV in 1954.

Having determined that S.B. 208 is valid, we come to the question of its effect. Consistent with the view expressed in the dissenting opinion of the Commission, TWX argues that there remains unchanged the standard that, before an additional competing common carrier can be certificated, the existing service must be shown to be inadequate. If this were true, S.B. 208 would not have changed the law.

The General Assembly in effect stated that henceforth the state's policy should be one of regulated competition and no longer that of regulated monopoly. "Competition" is the antithesis of "monopoly." We cannot believe that the legislature intended merely to indulge in semantics without changing the law. We believe that the General Assembly intended to change, and, in effect, did change the standard concerning inadequate service. Adequacy or inadequacy of service need no longer be the controlling

determinate, although it is evident from the Commission's decisions since S.B. 208 was adopted that this is one of the elements that it has considered.[1]

The Commission has made it plain in these decisions that it does not wish to permit unfair or destructive competition. This being true, the Commission also is correct in its determination here and in the other decisions that the controlling factor under S.B. 208 is the public interest.

## V.

At the time of the hearing Miller Bros. had 1800 contract customers. In a month preceding the hearing — apparently an average month — it transported 1,470,290 pounds of freight over its three routes from Denver on the one hand and Greeley, Loveland and Fort Collins on the other. The Commission found that Miller Bros. had a substantial portion of the existing freight being transported over those routes and that granting common carrier authority to it would in "no way impair the ability of the existing common carriers to render efficient public service under their respective certificates."

In the second report presented to the General Assembly's Legislative Study Committee on June 30, 1967, at page 119 it was stated with reference to S.B. 208, which had just been adopted:

"The 'gut' question probably is: Will it still be necessary to prove existing service inadequate before a new certificate is granted? If the Colorado Supreme Court answers this question in the affirmative, Senate Bill No. 208 will not have materially changed the existing law. On the other hand, if the Colorado Supreme Court answers such question in the negative, a door will have been opened to convert, upon proper proof, the existing contract carrier system to a competitive part of the common carrier system. How the Colorado Supreme Court will interpret Senate Bill No. 208 is

---

[1] These Colorado P.U.C. decisions are: *In Re Ephraim Freightways, Inc.*, No. 72429 (1969); *In Re Capron Truck Co.*, No. 72820 (1969); *In Re Ephraim Freightways, Inc.*, No. 75775 (1970); *In Re Rio Grande Motorway, Inc.*, No. 79057 (1971); *In Re Bill Clark Truck Line, Inc.*, No. 79342 (1971); and *In Re Thacker Brothers*, No. 79056 (1971).

a matter upon which the Public Utilities Commission is in no position to speculate."

■■■ We now answer the question in the negative and, according to the Commission's view in 1967, this opens the door to convert, *upon proper proof,* the existing contract carrier system to a competitive part of the common carrier system. The meaning of that prediction depends, of course, upon the definition of the term "upon proper proof." The dissenting Commissioner made the following statement:

"[T]he majority has 'converted' the Applicant to the status of motor vehicle common carrier. Indeed, both the Hearing Examiner and the majority of the Commission refer to this proceeding as a 'conversion.' This implies that there was some kind of 'grandfather' right in motor vehicle contract carriers to become motor vehicle common carriers when Senate Bill No. 208 was enacted. Such an interpretation of Senate Bill No. 208 is wholly inconsistent with its legislative history. That Bill was *not* a 'conversion' or 'grandfather' act intended to change the status of contract motor vehicle carriers holding Class 'A' Permits to that of motor vehicle common carriers."

While we do not agree that the majority of the Commission here simply converted a contract carrier into a common carrier under some kind of "grandfather" right, we agree that S.B. 208 was not a "grandfather" act. As pointed out by the dissenting commissioner, the initial draft of S.B. 208 contained provisions for the conversion of contract carriers into common carriers which might be characterized as "grandfathering." These conversion provisions were deleted from the act before its adoption. It is apparent to us that it was the intent of the General Assembly not to authorize mere "grandfathering."

We deem it necessary to make this statement by reason of the language quoted above from the second 1967 report to the General Assembly's committee. We recognize that, pragmatically, perhaps nearly all additional, competitive common carrier certificates will be issued to existing contract carriers. This does not lead to the result, however, that any contract carrier, whose operations more closely resemble that

of a common carrier than that of a contract carrier, is going to be automatically entitled to become certificated as a common carrier. The Commission did not do that in this case, but rather applied its guidelines in achieving the purposes of the statute. It did not simply "convert" or "grandfather."

Whether the Commission has independent constitutional authority to "convert" or "grandfather" has not been argued, and we do not reach the point.

## VI.

TWX has argued that the Commission has not used standards or criteria in the application of the "regulated competition" doctrine. We find to the contrary. While the Commission has not labeled its findings as criteria or standards, the findings here, as well as in the other cited post-S.B. 208 decisions, have the effect of disclosing the guidelines it follows. In this case these are as follows:

1. It ruled that the hearing examiner had erred in sustaining an objection to testimony because the testimony was proper to show:

"a. The availability of existing common carrier service;

"b. The adequacy of existing common carrier service; and

"c. The competitive character of existing common carrier service."

2. In this same connection it stated: "We point out that the terms, public interest and public convenience and necessity, go far beyond the conflicting economic interests of regulated utilities."

3. The Commission made detailed findings as to the ability of Miller Bros. to perform.

4. It found that Miller Bros. was the only carrier involved on some routes which also provided overnight service.

5. It found that Miller Bros. was currently handling some 20% to 40% of traffic.

The Commission stated that there is an existing public need for Miller Bros.' service as a contract carrier in the capacity as a common carrier.

6. The Commission went into detail as to the service being performed by existing common carriers with the implied

result that it would not materially impair the operations of these carriers.

In the majority opinion the Commission referred to its statements in *In Re Ephriam Freightways, Inc.*, No. 74435, announced February 27, 1970. There, in addition to the implied standards already mentioned, it announced the following:

1. The service of Ephraim (the applicant) was satisfactory, and in some cases, it was superior service.

2. Running through the testimony generally was the express desire and support for competition among carriers and, specifically, for competition among carriers of equal status.

3. It further stated that there was an existing public need for Ephriam's service as a common carrier.

4. The Commission found that the existing common carrier service was completely adequate and the existing certificated carrier was completely qualified to render any needed service, but there was sufficient volume to adequately support and maintain Ephraim and the existing certificated carrier.

5. The Commission imposed the condition that for 5 years Ephraim could not interline or interchange traffic with the existing certified common carrier, stating that this condition would protect the existing carrier from possible unfair competitive practices by Ephraim.

We are tempted to announce a set of guidelines, extracted from the statutes and decisions of other jurisdictions. This, however, lies solely within the province of the Commission. To repeat, the Commission is here acting in a legislative capacity. It needs to apply guidelines, and it is within our jurisdiction on appeal to see that it does. Also, it is within our authority to declare standards and criteria as unconstitutional and arbitrary, capricious, unreasonable or vague. As already stated, the Commission has applied guidelines. We rule that they are sufficient and that they are not invalid.

VII.

TWX argues: "Miller should not be permitted to benefit from its past unlawful operations. It was not operating 'under color of right.'" TWX cites *P.U.C. v. Verl Harvey, Inc.*, 150

Colo. 158, 371 P.2d 452 (1962); and *Donohue v. P.U.C.,* 145 Colo. 499, 359 P.2d 1024 (1961). As to this issue the trial court stated:

"The Petitioners further ask that the decision be set aside in that by law Miller should have been estopped from proving a public convenience and necessity by its unauthorized operations under Permit No. A-445.

"The law is clear that a carrier cannot establish a public need for additional service by its unauthorized operations. *McKenna* vs. *Nigro,* 150 Colo. 335. However, the evidence must establish that the carrier knowingly carried on an unauthorized operation with the intent to violate the law or with a reckless disregard for the law. *Donohue* vs. *P.U.C.,* 145 Colo. 499; *P.U.C.* vs. *Harvey,* -Colo-, 371 P.2d 452.

"The evidence in this case does not establish that Miller knowingly carried on an unauthorized operation with intent to violate the law or with a reckless disregard for the law; and, therefore, this Court affirms Decision No. 2370."

Here, we dispose of the matter on a different basis; but *see* the companion opinion of *Red Ball Motor Freight, Inc. v. P.U.C.,* 185 Colo. 438, 525 P.2d 439, as to the district court approach.

The Commission found that Miller Bros. was "completely qualified and fit to render the common carrier service for which it seeks certification." There is evidence in the record that Miller had terminated its prior methods of solicitation. There is nothing to suggest that Miller Bros. continued interlining after the cease and desist order. The argument that it has continued holding itself out as a common carrier appears to be predicated upon the fact that it still handles a large quantity of freight. In our view, it is implicit in the Commission's finding that Miller Bros. was not operating in violation of the cease and desist order. Therefore, the TWX argument falls.

## VIII.

There was some territory requested by Miller Bros. which the Commission did not certificate. A portion of this other territory was limited to 15 customers and, as already ruled,

that issue is moot. The Commission revoked the contract permit (A-445) embracing the remaining portion of the other territory.

1971 Perm. Supp., C.R.S. 1963, 115-11-10 provides:
"The commission, at any time, upon complaint by any interested party, or upon its own motion, by order duly entered, after hearing had upon notice to the holder of any permit, or any contract carrier by motor vehicle having registered under the provisions of section 115-11-15, issued under this article, and when it shall have been established to the satisfaction of the commission that such holder has violated any of the provisions of this article, or any of the terms and conditions of his permit or registration, or has exceeded the authority granted by such permit or registration, or has violated or refused to observe any of the proper orders, rules, or regulations of the commission, may revoke, suspend, alter, or amend any permit or registration issued under this article . . . ."
So far as is material here the statute which was amended in 1971 contains the same provision.

 Since the Commission did not give notice or hold a hearing, it had no authority to revoke the part of A-445 which embraced the remaining portion of the other territory. The trial court should have so ruled.

The judgments of the district court in the Complaint Case and in the Certificate Case are affirmed, except that the judgment of portion A-445 just discussed is reversed, and the causes are returned to the district court with directions to remand them to the Public Utilities Commission for action consonant with the views expressed in this opinion.