Argued October 31, affirmed December 18, 1963

# ARROW TRANSPORTATION CO. ET AL *v.* HILL, PUBLIC UTILITY COMMIS- SIONER, PORTLAND MOTOR TRANSPORT, INC., ET AL

387 P. 2d 559

*Robert R. Hollis* and *John G. McLaughlin,* Portland, argued the cause for appellants. With them on the briefs were Ellis & Hollis, Portland.

*John F. Weisser,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Robert Y. Thornton, Attorney General, and Lloyd G. Hammel, Assistant Attorney General and Chief Counsel for Public Utilities Commissioner, Salem.

*Earle V. White,* Portland, argued the cause for Intervenor Respondents. With him on the brief was White & Southwell, Portland.

Before McAllister, Chief Justice, and Rossman,

Perry, Sloan, O'Connell, Goodwin and Denecke, Justices.

O'CONNELL, J.

Plaintiffs brought this proceeding to set aside two orders of the Public Utilities Commissioner granting amended motor carrier permits to Portland Motor Transport, Inc. and Widing Transportation, Inc., who became intervenors in the proceeding. This is an appeal from the judgment of the Marion county circuit court sustaining the Commissioner's orders, on the ground that he had acted within the scope of his authority and upon substantial evidence.

In March, 1962 intervenors (hereafter referred to as applicants) filed applications with the Commissioner pursuant to the provisions of ORS chapter 767 for amended permits to authorize extensions of service in the transportation of petroleum products. At the time of the filing of their applications applicants held permits authorizing the transportation of petroleum products from Portland area origins to destinations throughout the state. The principal business of applicants is the transportation of refined petroleum products. About 47.5% of the refined products hauled by Portland Motor Transport, Inc., and about 57% of the refined products hauled by Widing Transportation, Inc. are taken south from the Portland area to Eugene or beyond.

The applications were precipitated by the installation of a pipeline for the movement of petroleum products from Portland to Eugene. Plaintiffs (hereafter referred to as protestants) protested the granting of the permits. All but one of the protestants has authority to originate traffic in Eugene although

the authority was not exercised prior to the installation of the pipeline. In the final analysis the controversy revolves around the applicants' right to originate traffic in Eugene. A consolidated hearing was held on both applications.

At the time of the hearing the pipeline had been in operation only a few days and the ultimate effect of the pipeline on applicants' and protestants' operation was uncertain. It was agreed, however, that substantial readjustments would be made in the former pattern of petroleum distribution. It is uncontroverted that as a result of the presence of the pipeline there is a surplus of tank transport equipment only a part of which can be absorbed for use along points on the pipeline. Protestants claim that as a result of this surplus they are capable of handling all traffic and that, therefore, there is no need for the applicants' services. Witnesses for both applicants indicate that there was a demand for the applicants' services and that they would make use of these services if they were made available.

The Commissioner found that there had been no showing that a grant of the requested permits would impair the ability of the protestants to serve the public and that a grant of the permits would be in the public interest. Protestants attack the trial court's judgment and the Commissioner's orders on the ground that there was no evidence to show that the public interest would be served by the granting of the permits to the applicants.

The authority of the Commissioner to issue common carrier permits is found in ORS 767.135. The pertinent part of that section provides that the Com-

missioner shall issue a permit "if * * * [he] finds from the record and the evidence that:

"* * * * *

"(c) The operation proposed is in the public interest;

"* * * * *

"(e) The granting of a permit will not result in the impairment of the ability of existing operators adequately to serve the public."

Protestants take the position that the Commissioner is not empowered to issue a permit to the applicants unless there is evidence establishing a need for applicants' services in transporting petroleum products from the terminus of the pipeline at Eugene. They contend that there is no such need if carriers with previous authority to transport petroleum from Eugene are adequately equipped to supply that service. It is undisputed that protestants had previously been granted permits to haul petroleum products from the Eugene area. They assert that they are adequately equipped to perform the service and that they are entitled to all of the traffic they can economically handle. In effect, they adopt the view that applicants must meet the criteria usually required as a condition to the issuance of a certificate of public convenience and necessity.

Applicants contend that they have produced sufficient evidence to show a need for their services. They assert, however, that an applicant may meet the requirement of need for service in spite of the fact that a carrier with an existing permit has the facilities to serve adequately all of the available traffic. The criterion, they contend, is not public convenience and necessity but whether the granting of an additional permit will serve the public interest.

If the Commissioner's findings and the evidence supporting them show that there was a need for applicant's services, the Commissioner's orders would clearly be unassailable in this case. The findings and evidence in this respect are difficult to appraise because both lack incisiveness, and further, because the term "need" appears to be used in different senses. Prior to the installation of the pipeline there was a "need" for the transportation of petroleum products from Portland to the Eugene area. Both the applicants and the protestants satisfied that "need." It does not follow that because there was such a need there was a need for the services of *both* the applicants and the protestants in the sense that one of them alone could not handle the traffic. In fact, it is likely that if any of the parties had been granted the monopoly for the Portland to Eugene haul it could have obtained sufficient equipment to handle all of the traffic.

After the pipeline was installed the customers of the applicants and of protestants continued to have the same "need" for petroleum products. Their need for transportation was diminished by the length of the pipeline from Portland to Eugene. There was a correspondingly diminished need for equipment to haul the petroleum products over the shorter distance from Eugene to the customer. With this diminution in the length of the haul, and the freeing of trucks and equipment for other use, it is quite possible that either the applicants or the protestants alone could handle all of the traffic from the Eugene source.

There was evidence that some of the petroleum distributors preferred applicants' services over those of the protestants, and there was evidence that some of the customers of the distributors preferred the services of the applicants principally because of ap-

plicants' familiarity with the customers' facilities.[1] Some of the applicants' witnesses attached significance to the fact that applicants offered a better type of compartmentalized hauling whereby split loads could be transported to the same destination.[2] Protestants presented evidence showing that they also owned and used compartmentalized equipment. But apparently it was not as readily available as that of the applicants.[3]

This evidence related, however, to conditions at the time the origin of the traffic was in Portland. The

---

[1] This was explained by one witness as follows:

"* * * [T]he service has been excellent with both [applicants] because of the relatively few numbers of drivers who deliver to our particular accounts; and many times those must be dispatched to arrive at a destination when the service station or bulk plant, whatever it is, is closed. The man is home in bed. They get in at three o'clock in the morning. The destination may be in Myrtle Creek or Myrtle Point or Bandon or Roseburg or Medford; and, in both cases, the driver is familiar with our facility, that they can unload it, having authority to unload it—both given to them by us as a shipper, as well as the customers who receive it; which is extremely important in our arrangement."

[2] The advantages accruing from compartmentalized hauling was explained by the witness as follows:

"It's very good, for a number of reasons. Both PMT and Widing have provided us the type of service we require, due to the peculiarities of our particular operation; both, first, their compartmentization, which is extremely important because of the nature of our business. Many times they will ship four commodities on one truck to one destination, or possibly two destinations, on one load or a split-load basis."

[3] One witness testified as follows:

"Q  Do you know whether or not other carriers can provide that type of compartmentized service?

"A  I never have found one.
"* * * * *

"Q  You want to let the examiner believe it has been your practice to tender Portland Motor Transport two thousand gallons of Ethyl, and that they have been able to transport it under conditions where other carriers were not able?

"A  Right."

installation of the pipeline may have left protestants with sufficient compartmentalized equipment to supply all of the needs of shippers from the new point of origin.

It is our conclusion that applicants did not produce substantial evidence that protestants were not able and willing to furnish adequate service from the terminus of the pipeline at Eugene. Nor do the Commissioner's orders contain findings in this respect.[4]

This presents the question of whether the availability of adequate service from carriers having existing permits to serve an area necessarily precludes the granting of a permit to an applicant who desires to provide service in the same area.

To answer the question it is necessary for us to inquire into the legislative purpose underlying the statutes providing for the regulation of motor carrier traffic in this state. Our present Motor Carrier Act states the policy broadly in ORS 767.020 (1) to be that "[t]he business of operating as a motor carrier of persons or property for hire upon the highways

---

[4] The Commissioner found that:

"The compartmented vehicles enable Applicant to transport various kinds and grades of products in one load. This is especially important to the consignees for the reason that a good many of them have comparatively small operations utilizing various products. They are not able to take a full load of any one product, but by ordering smaller amounts of different products they can take delivery of a complete load. The compartmented vehicles also enable Applicant to make deliveries of several products to different customers from the same load."

The Commissioner also found that there was a "demand" for applicants' services and that their services would be used if the permit was granted. None of these findings, however, negative the assertion by protestants that they can and will serve the needs of applicants' witness and others in the area.

of this state is declared to be a business affected with the public interest, and that regulated competition is desirable when it is deemed to be in the public interest." The policy is made more definite in ORS 767.135 which sets forth the prerequisites for the granting of a permit, namely, evidence that "[t]he operation proposed is in the public interest" and that "[t]he granting of a permit will not result in the impairment of the ability of existing operators adequately to serve the public." This language originated in Oregon Laws 1947, ch 467. The pre-existing statutes (OCLA 115–504) declared the policy in the following language:

> "The business of operating as a motor carrier of persons or property for hire upon the highways of this state is declared to be a business affected with the public interest, and that it is contrary to public policy and public interest that monopoly or monopolistic practices in motor transportation be permitted."

The concluding part of that section contained the following proviso:

> "* * * [P]rovided, however, that nothing in this act shall be construed as requiring or authorizing a compliance with, or an application of, any law or rule with respect to a certificate of public convenience and necessity as a condition to the granting of any permit authorized by this act."

And the procurement provisions (OCLA 115.511 (2) (c) stated the public interest criterion negatively, requiring a showing "[t]hat the operation proposed is not contrary to the public interest." OCLA 115–511 also contained the provision that "the granting of the permit will not result in the impairment of the ability of existing operators to adequately serve the public."

OCLA §§ 115-504 and 115-511 were carefully considered in *Pierce Freight Lines v. Flagg,* 177 Or 1, 159 P2d 162 (1944). The Oregon statutes were contrasted with statutes requiring an applicant to obtain a certificate of public convenience and necessity. The latter statutes, it was noted, express a policy of "regulated monopoly," favoring the existing carriers by requiring a new applicant to show that the existing carriers were unable or unwilling to handle the traffic. By contrast our statutes, it was said in *Pierce,* expressed a policy of "regulated competition." "Our statute," it was said, "goes no further in its regard for existing carriers than to require the denial of an application if it proposes an operation which will be contrary to the public interest or one which will impair the ability of existing carriers to serve the public adequately." (177 Or at 63) The court concluded: "[W]e do not think that we would be justified in holding that the clause concerning the public interest was intended to yield to the present carriers all of the traffic, provided they can handle it efficiently." When the motor carrier statutes were amended in 1947 (Oregon Laws 1947, ch 467) the clause rejecting the use of the certificate of public convenience and necessity and the clause declaring a policy against monopolies and monopolistic practices were eliminated from the new enactment. We do not regard the elimination of these clauses as indicative of a change in the legislative policy described in the *Pierce* case. The stated policy remains that of "regulated competition * * * when it is deemed to be in the public interest." "Public interest" rather than "public convenience and necessity" continues to be the criterion for the granting of motor carrier permits. It is reasonable to assume that if the legislature had intended to adopt the use of the certificate of public

convenience and necessity it would have included in the amended statute an express provision to that effect.

■ The difference between the test of "public interest" and the test of "public convenience and necessity" is, obviously, one of degree, i.e., the extent to which governmental regulation will be used to inhibit free competition. The legislative policy in this state is to regard motor carrier competition as desirable and to subject that competition to regulation only to the extent that it is necessary to do so in serving the public interest. Stated in another way, the policy is to protect existing carriers from the competition arising out of the granting of new permits only if there is necessity for such protection. There is no necessity for such protective regulation unless the granting of a new permit will presently or prospectively impair the ability of carriers with existing permits adequately to serve the public. Established carriers are entitled to protection only insofar as they need to be shielded from the danger of an oversupply of transportation services.[5] This is to be contrasted with the protection which is given existing carriers under the test of public convenience and necessity as traditionally applied. Under the latter test the existing carrier enjoys a modified form of monopoly, having the right to serve expanding needs if it can handle them adequately.[6]

---

[5] See, Fulda, Competition in the Regulated Industries: Transportation, p. 457 (1961).

[6] This view is expressed in the following quotation taken from Sinett v. United States, 136 F Supp 37, 42 (D.C. N.J. 1955):

"* * * In order to maintain an economical and adequate transportation system existing carriers normally should have the right to transport all traffic which they can handle in an adequate and efficient manner without the additional competition of a new operation."

The emphasis on "regulated competition" rather than "regulated monopoly" described in the *Pierce* case has received support elsewhere. Texas has rejected the view that competition is undesirable and has encouraged a regulated competition to insure adequate motorbus service.[7] This viewpoint receives further support in Fulda's study, Competition in the Regulated Industries: Transportation (1961). Fulda endorses a policy which would favor the freest possible competition among motor carriers subjecting them to regulation only to the extent necessary to prevent a harmful oversupply of transportation facilities.[8]

■ In applying this legislative policy the Commissioner was well within the limits of his authority in granting a permit to applicants even if the evidence can be regarded as establishing that protestants have available equipment to handle adequately all of the traffic out of the terminus of the pipeline at Eugene. The public interest is served by the continuation of the competition between applicants and protestants unless

---

[7] Southwestern Greyhound Lines, Inc. v. Railroad Commission, 208 SW2d 593 (Tex Civ App 1947); Kerrville Bus Co. v. Continental Bus System, 208 SW2d 586 (Tex Civ App 1947). The Texas approach is criticized in 27 Tex L Rev 515 (1949).

[8] In this connection Fulda notes the attempt made by Congressman Celler to define the relationship between free competition and regulation in a proposed enactment which contained the declaration that "the principles of free enterprise embodied in the anti-trust laws": shall be maintained "to the maximum extent practicable." Commenting on this proposal Fulda states:

"The Celler proposal offers a useful guide for defining the respective roles of competition and regulation. It reflects the idea that competition and regulation are complementary devices designed to achieve the same ends, and that the latter is to be used only when and to the extent that the former is not 'practicable' or would be 'destructive.' In other words, regulation should replace competition only when this is deemed necessary to insure satisfaction of all transportation needs of the public at lowest costs consistent with fair earnings for the carriers."

the change in circumstances resulting from the installation of the pipeline makes such competition inimical to the public interest.

■ The competition would be inimical to the public interest if it were shown that the ability of the protestants adequately to serve the public would be impaired. There was no evidence in the present case that this consequence would flow from permitting applicants to continue in competition with protestants. The applicants' burden of showing that the issuance of a permit to them would be in the public interest does not require them to prove that their continuance in competition would not impair the ability of protestants to adequately serve the public. As has been pointed out by the Interstate Commerce Commission in applying the Motor Carrier Act, it is not correct to presume "that because applicants may compete with motor carriers entitled to rights" under existing permits, "the interest of the competing carriers will be adversely affected to such extent that applicants' operations will be inconsistent with the public interest * * *."[①] To the same effect is *Application of Forde L. Johnson Oil Company,* 84 Idaho 288, 372 P2d 135, 137 (1962). There the court held that "if a protestant desires that the Commission be informed as to the effect which the granting of the application will have upon him, it is incumbent upon the protestant to make the showing," pointing out that the capabilities of the protesting carriers are "matters which are peculiarly within their knowledge."

■ Protestants contend that the Commissioner erroneously embraced within the concept of "public

---

[①] Jason W. House Contract Carrier Application, 1 MCC 725, 735 (1937).

interest" the consideration of the consequences to applicants' financial condition were they to be denied a permit. The Commissioner found that:

"1. Applicant has handled a share of the traffic in question for a good many years and has considerable capital investment involved to handle same;

"2. A denial herein will result in serious financial loss to and might result in the bankruptcy of Applicant;"

The financial difficulties suffered by an applicant as a result of the denial of a permit is not, it is contended, a factor which the Commissioner is authorized to consider in passing upon a motor carrier application. We do not agree. As we have already observed, the legislative policy in this state is to discourage monopoly and maintain motor carrier competition at the highest possible level, regulated only to the extent necessary to insure against the impairment of the ability of existing carriers to serve the public adequately. The maintenance of healthy competition is a factor to be considered in determining whether the public interest will be served. Applicants and protestants have been competitors. As the Commissioner's order recites, "the competitive picture will remain practically the same" if the permits are granted. The competitive picture will, of course, change in that there will be a decrease in business resulting from the elimination of the haul from Portland to Eugene. But this consequence is visited upon both applicants and protestants, and except for this difference in circumstance both stand in relatively the same competitive posture as they did before the pipeline was installed.

■ Protestants overlook the fact that under the peculiar facts of this case the Commissioner is called upon to consider not only how the granting of the permits would affect the protestants' ability to serve the public, but also how the denial of the permit would affect the applicants' ability to serve the public. If the consequence of denying permits to the applicants would be to force them out of business, the applicants' customers not affected by the installation of the pipeline would not have the applicants' service. That service, we must assume, was needed and was in the public interest or applicants would not have received their original permits. The interest of this portion of the public to have their transportation needs served was a factor which the Commissioner was entitled to consider in passing upon the application for an extension of service.

It is important to observe that the Commissioner was not presented with the usual case of an applicant attempting to move into a territory not previously served by him. Here the applicants had made their hauls to the same area they now seek to serve from another point of origin. They are not seeking to capture business previously within the domain of the protestants; they are simply attempting to preserve the business which they had already legitimately acquired. This, the protestants contend, is merely a request to "follow the traffic." It is argued by the protestants that the "follow the traffic" doctrine is now generally discredited. Until *Smith & Solomon Trucking Co. Extension, Camden, New Jersey,* 61 MCC 748 (1953) the Interstate Commerce Commission generally allowed a carrier to retain its permit when its shipper moved the source of traffic. In the *Smith & Solomon* case the Commission carefully examined the

so-called doctrine and, generally speaking, repudiated it. Subsequent cases decided by the Commission reveal, however, that the movement of a source of traffic may be a relevant factor in passing upon the carrier's application to operate from the new source.

It is of particular significance to note that when the Commission does allow a carrier to follow the traffic it is frequently observed that a denial of the request would result in a substantial impairment of the applicant's operations. For example, in *Kendrick Cartage Co. Extension, Paducah, Ky.*, 72 MCC 35, 37 (1957) the Commission's report states: "Another factor of considerable moment is the fact that a denial of the instant application would probably result in a complete termination of applicant's overall service * * *. It is patently clear that a loss of this income would affect its entire operation * * *. We feel that such an effect would not be consistent with the public interest and the national transportation policy."[⊗] In cases in which a request to follow the traffic is denied, frequently there is the implication that if the applicant's operations had been substantially impaired a permit would have been granted. Thus in *Shirmer Transportation Company, Inc. Extension, Superior, Wis.*, 76 MCC 293, 301 (1958), after noting that the applicant would lose less than 5.5% of its net operating profit as a result of the change in source of traffic, the Commission stated, "We are not convinced that loss of such revenue, should it occur, would be so disruptive of its financial position as to affect materially its service between other points."[⊗]

[⊗] J. L. Stroud Contract Carrier Application, 79 MCC 805, 13 Fed Car Cas, Para. 34,594 (1959); Helm's Express, Inc. Extension Mawhah, N.J., 67 MCC 183 (1956).

[⊗] H. H. Follmer Contract Hauling, Inc. Extension, Baltimore, Md., 82 MCC 18 (1959).

It further appears that the applicant's previous service to a shipper is a factor considered by the Commission in granting a permit to follow the traffic. In *Kendrick Cartage Co. Extension,* supra at p. 37, the Commission's report states: "It seems obvious that a sudden termination of this long-established service would seriously inconvenience not only the supporting shipper herein, but its numerous consignees as well, all of whom probably now deal with applicant on a thoroughly tested basis."

The fact is there is neither a doctrine for or against permitting a carrier to follow the traffic. This was made clear in *Smith & Solomon Trucking Company v. United States,* 120 F Supp 277, 279 (D.C. N.J. 1954). In describing the so-called doctrine the court said:

"* * * It is a commerce principle which time and again has entered into the facts of applications to the Commission. Where this element is present, its importance depends upon the circumstances of the case. The Commission considers it together with the other evidence before it."

And again the court explained:

"* * * By reason of that policy [the national transportation policy] itself the Commission must carefully weigh the entire relevant situation. If after that, a carrier application based on a 'follow the traffic' conception is shown to be reasonably required by public convenience and necessity (which would include proper allowance for other carrier rights and for the national transportation policy) the 'follow the traffic' principle invoked might well be the determining feature in the decision as to whether the application should be granted."

It should be noted that the follow the traffic doctrine has been appraised by the Interstate Com-

merce Commission in a context of "public convenience and necessity" where applicant's burden of showing need for its service is heavier than it is under our procedure. A policy of "regulated competition" leaves room for a more liberal treatment of an applicant's request to continue serving its existing customers at a new point of origin even though it may move the center of competition to a new locale.

For the foregoing reasons we are of the opinion that the Commissioner acted within the scope of authority delegated to him and that his order was supported by substantial evidence and adequate findings.

Judgment affirmed.