C. M. MOREY, doing business as Star
Motor Freight Lines,
Plaintiff-Appellant,

v.

The PUBLIC UTILITIES COMMISSION
OF the STATE OF COLORADO; Edwin
R. Lundborg, Edythe S. Miller and Sand-
ers G. Arnold, as the Members thereof;
Thacker Bros. Transportation, Inc.;
Ephraim Freightways, Inc.; Cargo and
Transportation Services, Inc.; Graves
Truck Lines, Inc.; and Regular Route
Common Carrier Conference of the Col-
orado Motor Carriers' Association, De-
fendants-Appellees.

No. 79 SA 301.

Supreme Court of Colorado,
En Banc.

June 8, 1981.

John P. Thompson, Thompson & Kelley, Denver, for plaintiff-appellant.

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., John E. Archibold, Sp. Asst. Atty. Gen., Denver, for defendant-appellee The Public Utilities Commission of the State of Colorado.

1. Since the inception of this litigation, Morey's interest in Star Motor Freight Lines has been transferred to Star Motor Freight Lines, Inc. *See* P. U. C. Decision No. C78–701.

2. A "common carrier" is defined, in pertinent part, as:

"Every person, directly or indirectly affording a means of transportation, or any service or facility in connection therewith, within this state by . . . motor vehicle . . . by indiscriminately accepting and carrying for compensation . . . property between fixed points or over established routes or otherwise. . . . "
Section 40–1–102(3), C.R.S.1973.
A "motor vehicle carrier" is defined as:
"Every person . . . owning, controlling, operating, or managing any motor vehicle used in serving the public in the business of the transportation of . . . property for compensation *as a common carrier* over any public highway between fixed points or over established routes, or otherwise, whether such business or transportation is engaged in or transacted by contract or otherwise. . . . "
Section 40–10–101(4)(a), C.R.S.1973 (emphasis added).

3. Under section 40–10–104(1), C.R.S.1973,
"No motor vehicle carrier shall operate any motor vehicle for the transportation of . . . property . . . upon the public highways of this state in intrastate commerce without first having obtained from the commission a certificate declaring that the present or future public convenience and necessity require or will require such operation. . . . "

Stockton & Lewis, Truman A. Stockton, Jr., John H. Lewis, Denver, for defendants-appellees Thacker Bros. Transp., Inc., Ehpraim Freightways, Inc., and Cargo and Transp. Services, Inc.

Edward T. Lyons, Jr., Jones, Meiklejohn, Kehl & Lyons, Denver, for defendants-appellees Graves Truck Lines, Inc. and The Regular Route Common Carrier Conference of Colorado Motor Carriers' Assn.

DUBOFSKY, Justice.

Appellant C. M. Morey, doing business as Star Motor Freight Lines (Star)[1], appeals from a district court order affirming a decision of the Public Utilities Commission (P. U. C. or Commission). The P. U. C. denied Star's application for a certificate of convenience and necessity authorizing it to transport general commodities as a motor vehicle common carrier[2] between Denver, Pueblo and Lamar, Colorado.[3]

Section 40–10–105, C.R.S.1973, prescribes the relevant rules governing issuance of certificates of convenience and necessity.

"(2) The granting of any certificate of public convenience and necessity to operate a motor vehicle for hire for the transportation of property shall not be deemed to be an exclusive grant or monopoly, *and the doctrine of regulated competition shall prevail.* The commission has authority to grant more than one certificate of public convenience and necessity to operate motor vehicles for the transportation of property over the same route or a part thereof or within the same territory or a part thereof *if the commission finds that the present or future public convenience and necessity requires or will require such operation."*
(Emphasis added.)
Star's original application sought authority from Denver to the Oklahoma state line via I–25 from Denver to Pueblo, Highway 50 from Pueblo to Lamar and Highway 287 from Lamar south to the Oklahoma state line. By Decision No. 90541, entered on April 5, 1977, the P. U. C. granted that portion of the application seeking common carrier authority between Denver and Colorado Springs. Star has subsequently withdrawn its request for authority to serve points between Lamar and the Oklahoma state line. For purposes of the present appeal, therefore, the common carrier certificate sought by Star would authorize service between Denver and intermediate points south to Pueblo, excluding the Denver-Colorado Springs corridor, and service between Pueblo and intermediate points in the Arkansas Valley east to Lamar.

We previously considered the Commission's denial of this application in *Morey v. Public Utilities Commission*, 196 Colo. 153, 582 P.2d 685 (1978) (*Morey I*). There we remanded the matter to the Commission for "a decision properly applying the doctrine of regulated competition." 196 Colo. at 158, 582 P.2d at 688. In compliance with our mandate, the P. U. C. reviewed the record and, in Decisions C78–1696 and C79–192, again refused to issue the certificate requested by Star. Star now contends that the P. U. C.'s decisions on remand misconceive our ruling in *Morey I* that "[u]nder the policy of 'regulated competition,' the controlling consideration is the *public need*," 196 Colo. at 156, 582 P.2d at 687 (emphasis in original), and are otherwise unsupported by competent or substantial evidence in the record. Because we conclude that the criterion of "public need" announced in *Morey I* is broad enough to subsume the decisional guidelines applied by the P. U. C. in Decisions C78–1696 and C79–192, and because we find that the Commission's findings and conclusions in those decisions are adequately supported in the record, we affirm the order of the district court.

Star has held contract carrier [4] authority to serve the routes in question for many years. However, it did not actively begin serving Pueblo until sometime after 1967, and did not initiate service to points in the Arkansas Valley until 1974. Shortly after it began operations in the Valley, Star filed an application for "conversion" to a common carrier with authority to serve Colorado Springs, Pueblo and the Arkansas Valley.[5]

Several common carriers already serving these routes or municipalities intervened to protest the application. After a series of hearings at which Star presented the testimony of public witnesses favoring its application and the protestants adduced evidence that additional competition would have an adverse impact on existing common carrier services, the hearing officer recommended approval of the greater part of Star's application.[6] The protestants filed exceptions to the examiner's recommended decision and, after reviewing the record of the hearing, the P. U. C. entered its own decision denying the bulk of the application but authorizing Star to operate as a common carrier between Denver and Colorado Springs.

Star appealed to the district court, which reversed the Commission and granted the entire authority recommended by the hearing officer. The protestants and the P. U. C. appealed to this Court, which affirmed the Denver-Colorado Springs certification, reversed the decision of the district court granting the remainder of the application, and remanded the cause to the Commission for reconsideration in light of the statutory policy of "regulated competition" adopted by the legislature in 1967, section 40–10–105(2), C.R.S.1973, and first construed by this Court in *Miller Brothers, Inc. v. Public Utilities Commission*, 185 Colo. 414, 525 P.2d 443 (1974) and its companion cases.

After remand, the Commission reviewed the record a second time and entered two new decisions, Nos. C78–1696 and C79–192, again denying Star's application. It is from these decisions that Star appeals.

---

**4.** A "contract carrier by motor vehicle" is defined as:

"Every ... person ... other than motor vehicle carriers as defined by section 40–10–101(4), owning, controlling, operating, or managing any motor vehicle in the business of transporting ... property of others ... for compensation or hire, over any public highway of this state between fixed points or over established routes, or otherwise, by special contract or otherwise."
Section 40–11–101(3), C.R.S.1973.
*Denver Cleanup Service, Inc. v. Public Utilities Commission*, 192 Colo. 537, 561 P.2d 1252

(1977), explains the statutory distinction between common and contract carriage.

**5.** For a historical overview of the "conversion" problem in Colorado, *see Miller Brothers, Inc. v. Public Utilities Commission*, 185 Colo. 414, 525 P.2d 443 (1974), and *Red Ball Motor Freight, Inc. v. Public Utilities Commission*, 185 Colo. 438, 525 P.2d 439 (1974).

**6.** The examiner recommended that authority be denied for the route south from Lamar to the Oklahoma line. Star did not persevere in seeking that authority and it is not in issue here. *See* n. 3, *supra*.

## I.

To understand the context in which the questions presented by this appeal have arisen, the bases for the remand in *Morey I* must be summarized. There the Commission ruled that, notwithstanding our decisions in *Miller Brothers, Inc. v. Public Utilities Commission, supra, Red Ball Motor Freight, Inc. v. Public Utilities Commission*, 185 Colo. 438, 525 P.2d 439 (1974); and *D & G Sanitation, Inc. v. Public Utilities Commission*, 185 Colo. 386, 525 P.2d 455 (1974):

"Even assuming ... that the testimony of [Star's] own presently satisfied customers makes out a case of public need, *there has been no showing of any substantial inadequacy in the existing service.* It is true, of course, that since [section 40–10–105(2)] a showing of inadequacy is no longer an indispensable element of every case. In several of the prior conversion cases, the adequacy issue was in fact relegated to fairly minor importance. *But those were unusual cases.* They marked the transition from the days of regulated monopoly to a competitive common carrier system. The establishment of a competitive system was the driving consideration in those earlier cases. It was necessary to look beyond the mere adequacy of existing service."

*Morey I*, 196 Colo. at 157, 582 P.2d at 688 (quoting from the decision of the P. U. C.) (emphasis added). Because Star, unlike the applicants in the *Miller Brothers, Red Ball,* and *D & G Sanitation* cases, did not commence its Denver-Pueblo and Arkansas Valley contract carrier services until after the enactment of section 40–10–105(2), the Commission distinguished Star's application for "conversion" from the applications granted in those earlier, "unusual" cases. In the Commission's eyes, Star's application for common carrier authority stood on "... the same footing as any other application in which a carrier is seeking to expand its operations into a new territory," *id.*, and it held that, in such cases, a certificate of public convenience and necessity may not be granted unless the applicant proves both a public need for the proposed services *and* a substantial inadequacy in the services furnished by existing common carriers. Since

Star's evidence failed to disclose any such inadequacy in existing common carrier services, the P. U. C. denied its application.

We rejected the Commission's purported distinction between the earlier "conversion" applications and Star's 1974 application. Recurring to our interpretation of section 40–10–105(2) in *Miller Brothers, Inc. v. Public Utilities Commission, supra,* we reasoned that the legislature intended the doctrine of "regulated competition" to supplant the old policy of "regulated monopoly" not for the limited purpose of integrating contract carriers then operating as *de facto* common carriers into the state's *de jure* common carriage transportation system, but for the broader purpose of bringing the common carrier industry in Colorado under a permanent regime of "regulated competition."

"There is simply no basis for this position of the Commission. Nowhere in [section 40–10–105(2)] does it say that the benefits of the 'regulated competition' doctrine are to be reserved for only those pre- [section 40–10–105(2)] contract carriers who were actively operating on the route in question at the time of its enactment. While it is true that the plight of those contract carriers existing at the time of the enactment of [section 40–10–105(2)] may have been the impetus for the reform, there is no indication that the legislature intended the relief to apply to only a small group of existing carriers."

*Morey I*, 196 Colo. at 158, 582 P.2d at 688. Having rejected the Commission's interpretation of section 40–10–105(2), we reaffirmed the interpretation of that statute advanced in *Miller Brothers, Red Ball* and *D & G Sanitation* :

"Under the doctrine of 'regulated monopoly,' the controlling consideration in granting a new certificate was whether the existing service was adequate or inadequate. Under the policy of 'regulated competition,' the controlling consideration is the *public need*. While adequacy of existing service is a factor to be considered, it is no longer the controlling determinant."

*Morey I, supra,* 196 Colo. at 156, 582 P.2d at 687 (emphasis in original).

In short, we remanded this case to the Commission because the Commission's denial of Star's application for common carrier authority rested on a legally erroneous reading of section 42–10–105(2). The error, however, was a narrow one: the Commission had ruled that a certificate could not be granted unless the applicant demonstrated that existing common carrier services were inadequate or materially insufficient. We held that failure to prove inadequacy was not, without more, an insuperable obstacle to certification. Therefore, on remand, we did no more than direct the Commission to reach a decision "properly applying the doctrine of regulated competition," *Morey I, supra,* 196 Colo. at 158, 582 P.2d at 688, *i. e.,* to determine whether a "public need" existed for Star's proposed services.

## II.

On remand, the P. U. C. abandoned its ruling that Star's application could not be granted because Star had failed to prove that existing common carrier services between Denver, Pueblo and points in the Arkansas Valley were inadequate. The Commission now bases its decision denying the application on a determination that the public's need for safe, adequate, economical and efficient transportation services and an economically sound transportation industry will not be met by granting Star's request for common carrier authority.

Star attacks this conclusion on two grounds. First it argues that "public need" under the doctrine of "regulated competition" is established, as a matter of law, by evidence that the public would be inconvenienced to the extent of being handicapped in the pursuit of business or comfort, or both, in the absence of the applicant's proposed services. Therefore, Star contends, the public testimony of its customers expressing a need or preference for its proposed services *ipso facto* demonstrates the existence of a "public need" which not only warrants but mandates issuance of the requested authority. Second, Star asserts that the record is devoid of competent evidence corroborating the Commission's finding that no "public need" exists for its services as a common carrier.

### A.

In *Miller Brothers, Inc. v. Public Utilities Commission, supra,* and subsequent cases construing the policy of "regulated competition" espoused by section 40–10–105(2), we emphasized that "public interest" or "public need" is the paramount consideration governing the issuance or denial of a certificate of public convenience and necessity. However, recognizing that an award of common carrier authority is a legislative prerogative, delegated to the P. U. C. by *Colo. Const.* Art. XXV and sections 40–10–104 and 40–10–105(2), we refused to propound more detailed standards to guide the exercise of the Commission's legislative power to "give life 'to the dead words of the statute,'" in specific factual settings. *McKay v. Public Utilities Commission,* 104 Colo. 402, 423, 91 P.2d 965, 975 (1939). *See Miller Brothers, Inc. v. Public Utilities Commission, supra; cf. Denver Cleanup Service v. Public Utilities Commission,* 192 Colo. 537, 561 P.2d 1252 (1977). Nevertheless, it is within our power on appeal to ensure that the guidelines formulated and applied by the Commission are not unconstitutional, arbitrary, capricious, unreasonable or vague. *Miller Brothers, Inc. v. Public Utilities Commission, supra.*[7]

In Decision No. C78–1696, the Commission set forth its guidelines for interpreting and applying the "public interest" or "public need" standard implicit in section 40–10–105(2):

"Under the doctrine of 'regulated competition' . . . adequacy of existing service no longer serves as a barrier to the certification of an additional carrier . . . in a

---

7. Our rejection of the inadequacy-of-existing-services test resuscitated by the Commission in *Morey I, supra,* exemplifies this jurisdiction and responsibility. In other cases, however, we have sustained Commission-prescribed guidelines interpreting the "public interest" or "public need" standard as reasonable exercises of its delegated legislative discretion. *See Miller Brothers, Inc. v. Public Utilities Commission, supra; Wells Fargo Armored Service Corporation v. Public Utilities Commission,* 190 Colo. 204, 545 P.2d 707 (1976).

territory which is already served by others. *It should nevertheless be understood that 'regulated competition' does not mandate that this commission grant unlimited or free entry to a would-be common carrier simply because the would-be common carrier may have served a number of shippers who would like to do business with him. The doctrine of 'regulated competition' does not permit this commission to forego its responsibility to exercise such regulatory control over the motor carrier industry so as to prevent excessive or destructive competition in that industry.* We have the statutory responsibility to exercise supervisory control over the certification of common carriers in such a manner as will promote safe, adequate, economical and efficient transportation to the public and foster sound economic conditions in transportation.

$$* \quad * \quad * \quad * \quad * \quad *$$

[W]e do not feel that Star has shown a public need for additional common carrier service. It is true, of course, that there were a number of public witnesses testifying in this proceeding who indicated their individual needs for the services of Star . . . . However, this testimony must be weighed carefully in the light of other facts and circumstances which appear of record bearing on the question of what will best serve not only the needs of the witnesses who testified here, but those of the public as a whole. This, we believe, is our statutory obligation."

(Emphasis added.)

Star takes issue with these guidelines insofar as they equate "public need" with the needs of the public as a whole rather than the needs and preferences expressed by individual customers testifying in favor of its application. Similarly, Star asserts that the "public need" standard precludes the Commission from considering the detriment which may be inflicted on the general public by excessive or destructive competition between common carriers. These arguments are without merit.

■ Nowhere in our earlier cases construing section 40–10–105(2) have we suggested that "public need" under the doctrine of "regulated competition" is to be measured solely or exclusively by the needs or preferences of an applicant's customers. Cf. *Public Utilities Commission v. Weicker Transfer and Storage. Company*, 168 Colo. 339, 451 P.2d 448 (1969). That their needs and preferences are probative of a "public need" for competitive services is indisputable. They are not, however, conclusive evidence of a "public need." The policy of *regulated* competition endorsed by section 40–10–105(2) reflects a legislative determination that *some* restraints on inter-carrier competition are necessary to protect the public interest. Star's interpretation of the "public need" standard is irreconcilable with that policy. If certificates of public convenience and necessity were made available, as a matter of right, to any applicant who could prove that one or more customers needed or preferred its proposed services, the statutory mandate to *regulate* competition would be illusory. "Regulated competition" is not synonymous with deregulation.

■ As a corollary of our holding that the "public need" is broader than the individual needs and preferences of an applicant's customers, we agree that the Commission may consider the impact additional competition may have, not only on the conflicting economic interests of competing carriers, see *Miller Brothers, Inc. v. Public Utilities Commission, supra*, but also on the ability of existing carriers to provide their customers and the public generally with safe, efficient and economical transportation services. *Id.; Wells Fargo Armored Services Corporation v. Public Utilities Commission, supra.* The obligation to safeguard the general public against the impaired services and/or higher rates accompanying destructive or excessive competition is at the heart of the policy of regulated competition:

"The difference between the test of 'public interest' and the test of 'public convenience and necessity' [as that test evolved under the doctrine of 'regulated monopoly'] is . . . one of degree, i. e., the extent

to which governmental regulation will be used to inhibit free competition. *The legislative policy . . . is to regard motor carrier competition as desirable and to subject that competition to regulation only to the extent that it is necessary to do so in serving the public interest.* Stated in another way, the policy is to protect existing carriers from the competition arising out of the granting of new permits only if there is a necessity for such protection. *There is no necessity for such protective regulation unless the granting of a new permit will presently or prospectively impair the ability of carriers with existing permits to adequately serve the public.* Established carriers are entitled to protection only insofar as they need to be shielded from the danger of an oversupply of transportation services. This is to be contrasted with the protection which is given existing carriers under the test of public convenience and necessity as traditionally applied. Under the latter test, the existing carrier enjoys a modified form of monopoly, having the right to serve expanding needs if it can handle them adequately."

*Arrow Transportation Company v. Hill*, 236 Or. 174, 184, 387 P.2d 559, 563–64 (1963) (emphasis added). *Accord Mount Hood Stages, Inc. v. Hill*, 243 Or. 283, 413 P.2d 392 (1966); *Black Ball Freight Service, Inc. v. Washington Utilities and Transportation Commission*, 74 Wash.2d 871, 447 P.2d 597 (1969); *Browning-Ferris Industries of New Hampshire, Inc. v. Public Utilities Commission*, 116 N.H. 261, 356 A.2d 675 (1976); *Mount Hood Stages, Inc. v. Haley*, 4 Or. App. 385, 478 P.2d 645 (1970); *Borich Transfer Co. v. Haley*, 2 Or.App. 606, 469 P.2d 638 (1970); *State of Missouri ex rel. Beaufort Transfer Co. v. Clark*, 504 S.W.2d 216 (Mo.App.1973); *Re: New York Central Transport Co.*, 39 PUR 3d 106 (New York Public Service Commission 1961); *Re: Hill's Transportation Co.*, 39 PUR 3d 271 (California Public Utilities Commission 1961); 1 *A. Priest, Principles of Public Utility Regulation*, Ch. 9 (1969); *C. Fulda, Com-*

*petition in Regulated Industries: Transportation* (1961); *Smyser, Regulation of Motor Carriers in South Dakota: "Regulated Monopoly" or "Regulated Competition,"* 11 *So. Dak.L.Rev.* 27 (1966).[8]

■ Mindful of the deference owed to guidelines adopted by the Commission and of the conceptual underpinnings of the policy of "regulated competition," we find nothing unreasonable, arbitrary, capricious or contrary to law in the guidelines announced by the Commission in this case. Its conclusions, first, that "public need" means the needs of the public as a whole, not simply the needs of witnesses who testify in favor of an applicant's proposed services and, second, that "public need" may be so disserved by destructive competition as to justify denial of an application for common carrier authority are well within the ambit of its discretion under section 40–10–105(2).

### B.

Star's second challenge to the P.U.C.'s decisions in this case disputes the adequacy of the evidence to support the Commission's finding that authorization of additional common carrier service between Denver, Pueblo and points in the Arkansas Valley would result in destructive competition inimical to the public's need for a safe, efficient and economical transportation system.

Specifically, the Commission found that: "The interjection at this time of another common carrier in the [Denver-Pueblo] area would unreasonably dilute the available traffic among several carriers to the point where adequate and efficient service to the public would be impaired rather than promoted, which would in turn result, in the judgment of the Commission, in an eventual deterioration of service and higher rates for the public.

\*  \*  \*  \*  \*  \*

Star is not presently a major competitive factor in the relevant transportation market at Pueblo. Thus to grant this portion

---

**8.** We do not intimate that "destructive competition" is the *only* factor that the Commission may consider in deciding whether "public

need" merits protective regulation. *See Miller Bros., Inc. v. Public Utilities Commission, supra; Borich Transfer Co. v. Haley, supra.*

of Star's application, and thereby to impose on Star an obligation to establish and maintain appropriate common carrier service at Pueblo would result, in our judgment, in a wasteful duplication of services and facilities. Such a wasteful duplication of services and facilities is destructive rather than regulated, competition and is contrary to the public interest.

\* \* \* \* \* \*

[I]t would be contrary to the public interest to provide for the establishment of the common carrier service which Star proposes ... from Pueblo east to Lamar.... This is an area of relatively long operating distances, sparse population, and lack of significant growth in population. There are presently at least two, and in some instances three authorized common carriers providing scheduled service vying for the limited amount of available traffic along the routes from Pueblo to Lamar.

\* \* \* \* \* \*

Many of the existing schedules along these routes are running partially empty at the present time.... As Graves increases its relatively new common carrier service in the area, the problem of excess competition among existing common carriers will undoubtedly become more acute. Further dilution of this traffic by mandating the establishment of another common carrier service in the area could, in the judgment of the Commission, result in higher per shipment operating costs for carriers serving the area. An inflation of the common carrier rate level or a curtailment of services on which the public now depends, if not both, is likely to result."

Based on these findings of destructive competition and impairment of existing services, the Commission concluded that the public interest would be disserved by Star's proposed operations and denied the application.

It is axiomatic that the findings and conclusions of the Commission are presumed to be reasonable and valid, *Colorado Municipal League v. Public Utilities Commission*, 197 Colo. 106, 591 P.2d 577 (1979), and will not be disturbed if supported by substantial evidence in the record. *See Sangre de Cristo Electric Association v. Public Utilities Commission*, 185 Colo. 321, 524 P.2d 309 (1974). Moreover, that evidence must be reviewed in the light most favorable to the P.U.C.'s findings and decision. *People's Natural Gas Division of Northern Natural Gas Co. v. Public Utilities Commission*, 193 Colo. 421, 567 P.2d 377 (1977). Neither may a reviewing court substitute its judgment for that of the Commission. *Id.; Northeastern Motor Freight, Inc. v. Public Utilities Commission*, 178 Colo. 433, 498 P.2d 923 (1972). It is peculiarly within the province of the Commission to decide what weight is to be accorded the evidence, *Contact-Colorado Springs, Inc. v. Mobile Radio Telephone Service, Inc.*, 191 Colo. 180, 551 P.2d 203 (1976), and to choose among the conflicting inferences which may be drawn therefrom, *id.*, especially in cases posing evidentiary questions addressed to the expertise and judgment of the Commission and its staff. *Colorado Municipal League v. Public Utilities Commission, supra; Atchison, Topeka and Santa Fe Ry. Co. v. Public Utilities Commission*, 194 Colo. 263, 572 P.2d 138 (1977).

Here, the protestants adduced voluminous evidence which tended to show that the market for transportation services in the affected areas was relatively inelastic, that the operating capacities of existing common carriers serving those areas were severely underutilized, that operating revenues were low, and that additional competition for present or prospective business would seriously impair the ability of existing carriers to continue to provide efficient and economical service to the general public. While this evidence did not go unchallenged by Star,[9] it was for the Commission

---

**9.** Star argues with some cogency that because it is already a full-fledged competitor in the relevant markets, a conversion to common carrier status would not disturb the existing balance of competitive forces. The Commission, however, found otherwise. Star, under its contract carrier permit, has neither interlined freight with other carriers nor solicited busi-

to weigh this highly technical evidence and draw those inferences which, in its informed judgment, it deemed best warranted by the data before it. We would overstep our statutory authority under section 40–6–115(2) and (3), C.R.S. 1973, were we to substitute our inferences and findings for those of the Commission.

Judgment affirmed.

ness through advertisements. It may well be that a conversion to common carrier status—which would authorize it to pursue these avenues of expansion—would tip the balance toward excessive or destructive competition. Moreover, as a common carrier Star would be obligated to provide service in the areas included in its application, an obligation which does not now encumber its operations. It is not inconceivable that this additional financial burden would encourage it to compete aggressively and destructively for existing and prospective business. It is precisely this kind of choice between competing inferences which the legislature has committed to the expertise of the Commission.