**Colorado Municipal League v. Public Utilities Commission of the State of Colorado; Commissioners Edwin R. Lundborg, Edythe S. Miller and Henry E. Zarlengo; and Mountain States Telephone and Telegraph Company, and Frances Allen; Administrator of General Services; Lou Bluestein; Metro-Denver Chapter, Colorado Motel Association; George Falconer Wilson; Regents of the University of Colorado; Denver Burglar and Fire Alarm Company, d/b/a ADT Security Systems**

## No. 27789

**The Mountain States Telephone and Telegraph Company, a Colorado corporation v. Public Utilities Commission of the State of Colorado and Henry E. Zarlengo, Edythe Miller and Edwin R. Lundborg, Commissioners, and Colorado Municipal League; Lou Bluestein; Frances Allen; General Services Administration; Metro Denver Motel Association; George Falconer Wilson; Colorado Retail Council; Communications Workers of America; Regents of the University of Colorado; Denver Burglar and Fire Alarm Company; and American District Telegraph Company, d/b/a ADT Security Systems**

(591 P.2d 577)

Decided February 5, 1979. Opinion modified and as modified petitions for rehearing denied March 19, 1979.

108

Gorsuch, Kirgis, Campbell, Walker and Grover, Leonard M. Campbell, Gary S. Cohen, for Colorado Municipal League.

J. D. MacFarlane, Attorney General, David W. Robbins, Deputy, Eugene C. Cavaliere, Assistant, for The Public Utilities Commission of the State of Colorado and Edwin R. Lundborg, Edythe S. Miller and Sanders G. Arnold, as successor in office to Henry E. Zarlengo.

Coleman M. Connolly, for The Mountain States Telephone and Telegraph Company.

*En Banc.*

MR. CHIEF JUSTICE HODGES delivered the opinion of the Court.

These cases were consolidated in the trial court and the appeals from the trial court judgments are likewise consolidated by this court.

On March 7, 1975, Mountain States Telephone and Telegraph Company (Mountain Bell) filed with the Public Utilities Commission (PUC) an advice letter and tariff revisions which would have produced additional annual gross revenues of $40,323,000. On March 25, 1975, pursuant to section 40-6-111(1), C.R.S. 1973, the PUC suspended these tariffs and scheduled public hearings on the proposed rate increase.

After extensive hearings, the PUC issued Decision No. 87582 (Decision A) on October 7, 1975. It allowed Mountain Bell to increase its gross revenues in the amount of $11,466,000, rather than the $40,323,000 requested. Decision A also authorized Mountain Bell to change the formula

it uses to establish the amount of its service charges paid to American Telephone and Telegraph Company (AT&T). This change would increase Mountain Bell's annual operating expenses by approximately $1,000,000. Decision A concluded Phase I of the case. On appeal, the Colorado Municipal League (League) challenges the portion of the decision approving the increased service charge payment to AT&T. Mountain Bell, in turn, contests the PUC's treatment of its job development investment tax credits.

Phase II of this rate case before the PUC dealt with the allocation of the $11,466,000 gross revenue increase among the various classes of ratepayers. On October 30, 1975, the PUC issued Decision No. 87701 (Decision B) which established new rates and charges for Mountain Bell's intrastate telecommunications services. The following four aspects of this decision are challenged on appeal: (1) PUC's authorization to Mountain Bell to surcharge municipal tax, franchise, and license payments to residents of the municipalities, (2) PUC's decision to increase the rate charge for pay stations from 10¢ to 20¢ except in those locations which are determined to have high concentrations of poor and elderly and its determination not to accord any revenue impact to this change, (3) PUC's adjustment of revenues accruing to Mountain Bell from new directory assistance charges, and (4) PUC's order that Mountain Bell partially reimburse the Colorado Municipal League (League) for legal costs and expert witness fees expended in the rate proceedings.

The League also challenges in this appeal the PUC's approval of an interim rate increase prior to implementation of Decision B. On October 31, 1975, Mountain Bell filed an application to place into effect, on less than 30 days notice, tariff revisions designed to produce additional revenues of approximately 11.4 million, in accordance with the rates authorized in Decision B. On November 12, 1975 in Decision No. 87749 (Decision C), the PUC approved this application for an interim period, in the event that Decision B was stayed by virtue of the filing of an application for rehearing, reargument, or reconsideration. Decision C provided that the interim rates were to be effective from the time that an application for rehearing of Decision B was filed until December 19, when presumably the PUC would have disposed of all applications for rehearing. On November 18, the League filed a petition for rehearing, reargument, or reconsideration of Decision B. On December 16, the PUC denied the last of the applications for rehearing, reargument or reconsideration. During this period, Mountain Bell collected increased rates, pursuant to Decision C. On appeal, the League asserts that the establishment of these interim rates by the PUC and the collection of the rates by Mountain Bell between November 18 and December 16 were unlawful.

The district court affirmed the PUC decisions in all respects. The League and Mountain Bell seek appellate review by this court of the

decisions of the PUC under section 40-6-115, C.R.S. 1973 (1976 Supp.). Under that statute, this court is limited to a review of the record to determine whether the PUC has "regularly pursued its authority." This also includes a determinaton of whether the decision under review is constitutionally adequate, whether it is just and reasonable, and whether the PUC's findings are in accordance with the evidence. In undertaking this review, we bear in mind that the PUC members who arrived at these determinations took extensive testimony and possess considerable expertise in the subject matter. *See Mountain States Telephone & Telegraph Co. v. Public Utilities Commission,* 182 Colo. 269, 513 P.2d 721 (1973).

## I. *Contractual Expenses with AT&T*

AT&T provides various services and privileges, such as use of patents, research development, and legal, engineering, and accounting advice to Mountain Bell and to other Bell System operating companies, under what is known as the General Services and License Agreement. In return, the operating companies, such as Mountain Bell, make an annual monetary payment to AT&T. From 1948 to October 1, 1974, Mountain Bell paid an amount equal to 1% of its net revenues. On October 1, the companies altered the method of payment to reflect the actual cost which AT&T incurred in providing its services, but not to exceed 2 1/2% of Mountain Bell's net revenues.

The change in method of payment resulted in an increase in Mountain Bell's annual operating expenses of over $1,000,000. In Decision A, the PUC allowed these payments as just and reasonable expenses, subject to a $9,000 disallowance for the cost of AT&T's corporate contributions and a $65,000 disallowance for AT&T's advertising costs. Bearing in mind that the cost payment method was utilized for only three of the twelve months of the 1974 test year, the PUC ruled that Mountain Bell would be required in future rate proceedings to submit further proof of the reasonableness of the formula used by AT&T in establishing Mountain Bell's share of its costs.

The League asserts here that the PUC's allowance of the new payment formula without requiring Mountain Bell or AT&T to submit detailed evidence of the nature and costs of the services provided, constituted an arbitrary and capricious abuse of its discretion. Examination of the record convinces us that the PUC's conclusion that Mountain Bell carried its legal burden of proving its contract payments were reasonable and expended for services which benefited its ratepayers, is in accordance with the evidence. *See New Jersey Bell Telephone Company v. Department of Public Utilities,* 12 N.J. 568, 97 A.2d 602 (1953). Lloyd Leger, the Colorado manager of Mountain Bell, gave uncontradicted testimony that Mountain Bell's increased payments to AT&T were directly related to AT&T's costs in providing its services. In light of the fact that the new

system only had been in operation for three months of the test year, we regard the evidence in the record as sufficient to support these expenses as just and reasonable, without requiring a much more detailed itemization of costs. We, therefore, affirm Decision A in this respect.

## II. *Job Development Investment Tax·Credits*

■ Mountain Bell contests the treatment accorded by Decision A to its Job Development Investment Tax Credits (JDIC). The Revenue Act of 1971, 26 U.S.C. § 46(f), establishes an investment tax credit for public utility property.[1] In order to assure that the benefits of this credit are apportioned among both stockholders and ratepayers, Congress created only two permissible means to qualify for JDIC benefits. Under Option 1, the rate base, but not the cost of service, may be reduced; under Option 2, the cost of service may be reduced but not the rate base. Any treatment of the JDIC by the regulatory commission which does not comply with either Option 1 or 2 renders that utility ineligible for benefits.

Mountain Bell elected Option 2, that is, it chose to use the tax credit to reduce its cost of service, rather than its rate base. On appeal, Mountain Bell contends that the PUC's treatment of the tax credit is not in accordance with Option 2 and, if not modified, will render Mountain Bell ineligible for benefits.

The PUC calculated Mountain Bell's revenue requirement by multiplying its capital assets by set rates of return and by assigning the unamortized JDIC a zero rate of return. Mountain Bell asserts that the cost of capital approach employed by the PUC is the functional equivalent of a reduction in rate base and is therefore prohibited under Option 2.

We turn to the legislative history of the Revenue Act of 1971 to interpret the meaning of "rate base reduction" as used in § 46(f). This legislative history indicates unmistakably that under § 46(f), the assignment of a zero cost of capital to the unamortized JDIC will be considered a rate base adjustment. Federal law requires that the tax credit be assigned a rate of return comparable to that assigned to capital contributed by investors, or a reduction in the rate base is deemed to occur. *See* Senate Report No. 92, 92nd Cong., 1st Sess., *reprinted in* [1971] U.S. CODE CONG. & AD. NEWS 1946 ("[I]f the 'cost of capital' rate assigned to the credit is less

---

[1] 26 U.S.C. § 46(f) provides in part:

"(f) *Limitation in case of certain regulated companies.*

"(1) *General rule.* Except as otherwise provided in this subsection, no credit shall be allowed by section 38 with respect to any property described in section 50 which is public utility property (as defined in paragraph (5)) of the taxpayer —

"(A) *Cost of service reduction.* — If the taxpayer's cost of service for ratemaking purposes is reduced by reason of any portion of the credit allowable by section 38 (determined without regard to this subsection); or

"(B) *Rate base reduction.* — If the base to which the taxpayer's rate of return for ratemaking purposes is applied is reduced by reason of any portion of the credit allowable by section 38 (determined without regard to this subsection)."

than that assigned to common shareholder's investment, that would be treated as, in effect, a rate base adjustment)"; H. R. REP. NO. 92, 92nd Cong., 1st Sess., *reprinted in* [1971] U.S. CODE CONG. & AD. NEWS, 1841.

■ Upon reconsideration, the PUC concedes that it inadvertently and unintentionally effected an indirect reduction in rate base, and accordingly, requests that this court reverse its prior determination. We conclude similarly from our examination of legislative history that the PUC's treatment of the JDIC must be modified in order to serve the PUC's announced regulatory purpose of qualifying Mountain Bell for these tax credits. We, therefore, reverse the district court judgment regarding this portion of Decision A and order a remand to the PUC with directions to modify its decision in a manner consonant with this opinion.

### III. *Surcharge to Municipal Customers*

■ The League and Mountain Bell challenge various aspects of the Phase II proceeding. In Decision B, the PUC determined the spread of the $11,000,000 revenue increase among various classes of ratepayers. The League contends that the PUC's authorization for Mountain Bell to surcharge municipal franchise, license, and tax payments to customers living within the municipalities imposing the payments is arbitrary and capricious. We agree and reverse that part of the judgment of the trial court which affirmed the PUC's surcharge authorization.

In *City of Montrose v. PUC,* 197 Colo. 119, 590 P.2d 502, announced simultaneously with this opinion, we held that the PUC's order to Rocky Mountain Natural Gas Company to surcharge municipal franchise fees to the municipalities it served, resulted in unjust and discriminatory rates and was accordingly invalid. The record revealed clear and undisputed evidence that it was more expensive to furnish service to rural customers than to customers in more densely populated municipalities. The utility also presented undisputed evidence that the municipal franchise fees represented costs of doing business which it otherwise would incur to pay for rights-of-way and to finance condemnations. Accordingly, we concluded therein that Rocky Mountain Natural Gas Company's prior practice of expensing franchise charges on a statewide basis was a reasonable method of offsetting the urban subsidization of rural customers and was the proper way of expensing the costs of doing business.

We find that the reasoning set forth in *City of Montrose v. PUC, supra,* applies with equal force to the present case. As admitted by Mountain Bell's expert witness Mr. Heath at the October 23, 1975 hearing, the urban areas have traditionally subsidized and presently subsidize the rural areas with respect to telephone rates. The League also offered testimony and the PUC commented in its decision that Mountain Bell's payments to municipalities are made to compensate them for rights-of-way and for the cost of street repairs and maintenance.

Accordingly, we find that the portion of Decision B ordering Mountain Bell to surcharge municipal tax, license, and franchise charges is arbitrary, capricious and invalid. Value of service should be the polestar of rate regulation; ideally, rates should not be fragmented according to isolated groups and special expenses. The judgment of the trial court is reversed in this respect and we direct a remand to the PUC to withdraw this authorization.

## IV. *Coin Operated Phone Rates*

■ The League also challenges the PUC's determination in Decision B to increase the cost of a local call from a public coin telephone from 10 cents to 20 cents, except in those areas where there are high concentrations of "poor and elderly" persons and its decision not to accord any revenue impact to this change. For the reasons expressed in *Mountain States Legal Foundation v. PUC,* 197 Colo. 56, 590 P.2d 495, we find that the PUC lacks authority to effect social legislation by ordering that pay phone rates be reduced according to age and indigency classifications. We therefore hold that the portion of Decision B providing for lowered coin operated phone rates in neighborhoods where there is a concentration of poor and elderly persons is invalid. Accordingly, the judgment of the trial court is reversed for remand to the PUC with directions to modify its decision in a manner consonant with this opinion.

The PUC's decision not to accord any revenue impact to the doubling of the coin phone operated rate is reasonable. The PUC's approval of the new rates was conditioned on Mountain Bell's first installing dial tone capabilities to all coin operated phones and the PUC's finding that the increased revenues is counterbalanced by the increased investment in new equipment is supported by the evidence. We therefore affirm the trial court's judgment in this respect.

## V. *Directory Assistance Charges*

■ The League appeals from another portion of Decision B dealing with the revenue effect to be derived from directory assistance charges. In Decision B, the PUC authorized Mountain Bell to change its method of charging for directory assistance from an unlimited number of free directory assistance calls to a charge of 20¢ for each request in excess of five per month. The PUC found that the total annual revenue effect of the approved plan would be $2,690,000. The PUC, however, applied only 5/12 of that amount or $1,120,833 to Mountain Bell's revenue requirement on the ground that Mountain Bell would not implement the plan for seven months and had indicated that it would be filing for another rate increase in 1976. The Commission further stated that if Mountain Bell did not file for a rate increase in 1976, the Commission would initiate a proceeding to evaluate whether a further reduction of rates was justified.

On appeal, the League points to events occurring after the decision to attempt to demonstrate that the PUC's decision in this regard is arbitrary

and capricious for not applying the full 100% of resulting revenues. The fact that Mountain Bell did not file for another rate increase in 1976, and the fact that the PUC did not initiate a proceeding to reevaluate the company's revenue requirements are the events occurring after the decision. The League argues that, therefore, Mountain Bell received an unlawful windfall.

The League's contention disregards the fact that this proceeding is brought under section 40-6-115, C.R.S. 1973 (1976 Supp.), which limits judicial review to the record: "No new or additional evidence may be introduced in the district court, but the cause shall be heard on the record of the Commission as certified by it." Section 40-6-115(1), C.R.S. 1973 (1976 Supp.).

In *Mountain States Telephone and Telegraph Co. v. Public Utilities Commission,* 182 Colo. 269, 513 P.2d 721 (1973), we held that this court could not consider evidence of the actual effect of the PUC's decision, because courts lacked statutory authority to conduct a *de novo* hearing on evidence which was not presented to the PUC. *See also Eveready Freight Service, Inc. v. Public Utilities Commission, et al.,* 131 Colo. 172, 280 P.2d 442 (1955).

In the present case, we find that the League's attempt to introduce evidence of Mountain Bell's "windfall" earnings subsequent to the decision is also beyond the scope of judicial review. Based on our examination of the record, we are convinced that the PUC's decision to assess the revenue effect of directory assistance charging at 5/12 of the annual amount was reasonable, particularly in light of Mountain Bell's intention not to implement the plan for seven months. Accordingly, we affirm Decision B in this respect.

### VI. *Expert Witness Fees*

Mountain Bell challenges the portion of Decision B requiring it to reimburse the League for certain of the expert witness fees, attorney's fees, and legal costs expended in these rate proceedings before the PUC. The League disputes this portion of the order because it does not award the full amount of the charged expert witness fee. In *Mountain States Telephone and Telegraph Co. v. Public Utilities Commission,* 195 Colo. 130, 576 P.2d 544 (1978), this court recognized that the PUC has constitutional and statutory authority to order Mountain Bell to pay reasonable attorney's fees, expert fees, and costs incurred by an intervenor or protestant who appears in the public's interest. It was also held therein that the PUC had acted reasonably in awarding only partial reimbursement of the fee charged by a protestant's expert witness.

In the present case, we find similarly that the PUC's decision to reimburse the League for only $1,000 of the $4,000 fee charged by the expert witness is reasonable, that it complies fully with the Commission's guidelines for awarding such fees, and it is supported by evidence in the

record. Accordingly, we affirm this portion of Decision B.

### VII. *Authorization of Interim Rates*

The final issue raised on appeal concerns Decision C, in which the PUC approved interim rates for Mountain Bell on less than 30 days notice. The League asserts that the PUC had no authority to set interim rates, and alternatively if it does have such authority, it did not follow proper procedure in issuing Decision C. The League requests, therefore, that the increased revenues collected by Mountain Bell between November 18 and December 16 be refunded to the public because the PUC order authorizing it was invalid.

To comprehend the League's contention, a brief sketch of the statutory scheme of regulation is necessary. The Public Utilities Law, section 40-1-101, *et seq.,* C.R.S. 1973 (1976 Supp.), establishes a "file and suspend" procedure for the setting of public utility rates in Colorado. First, the public utility files a new rate schedule. This schedule goes into effect ordinarily 30 days after filing (*see* section 40-3-104, C.R.S. 1973) unless the PUC orders a period of suspension to study and conduct hearings on the reasonableness of the proposed rates. The maximum period of suspension authorized by statute is 210 days, and if the PUC has not made a decision within 210 days the proposed rates are automatically implemented. Section 40-6-111, C.R.S. 1973. After the PUC issues its initial decision, the parties have 20 days to file an application for rehearing, reargument, or reconsideration. Section 40-6-114(1), C.R.S. 1973. The filing of such an application stays the initial decision pending final disposition by the PUC. Section 40-6-114(2), C.R.S. 1973.

The problem which arose in the present case is that the PUC did not complete the entire process of tariff approval within the 210 day period of suspension. Rather than have Mountain Bell's initially proposed rates (which sought a revenue increase of over $40 million) go into effect, the PUC in Decision C approved the institution of lower rates which it had authorized.

At the outset, we note that no statute specifically authorizes the PUC to establish temporary rates. The Public Utilities Law contemplates that PUC decisions implement permanent rate changes and are stayed automatically upon the filing of an application for rehearing, reargument, or reconsideration. Decision C, on the other hand, only approved Mountain Bell's proposed rates for an interim period and became effective at a prescribed time, whether or not an application for rehearing was filed.

Even in the absence of specific statutory authority, we find that the PUC had implied power under the statute and under the Colorado Constitution to establish the interim rates adopted in Decision C. These rates were approved for the period after the 210-day suspension time had expired and after extensive public hearings on the amount of the proposed rates had been held. This authority is inherent in the broad discretion

granted to the PUC to suspend and approve rate increases under the Public Utilities Law. *See State ex rel. LaClede Gas Co. v. Public Service Commission,* 535 S.W.2d 561 (Mo. App. 1976); *State ex rel. Utilities Commission v. Morgan,* 16 N.C. App. 445, 192 S.E.2d 842 (1972); *Chesapeake & Potomac Tel. Co. v. Public Service Commission,* 330 A.2d 236 (D.C. App. 1974). Moreover, this power is fully contained within the broad grant of authority given to the PUC in Article XXV of the Colorado Constitution. *See Aspen Airways, Inc. v. Rocky Mountain Airways, Inc.,* 196 Colo. 285, 584 P.2d 629 (1978) which affirmed PUC's authority under the Colorado Constitution to issue grants of temporary authority to airlines. *See also Mountain States Telephone and Telegraph Co. v. Public Utilities Comm.,* 195 Colo. 130, 576 P.2d 544 (1978); *Miller Bros., Inc. v. Public Utilities Commission,* 185 Colo. 414, 525 P.2d 443 (1974).

We also reject the Leagues contention that the PUC erred in issuing the interim rates pursuant to Rule 18 I.B. of the Rules of Practice and Procedure Before the Public Utilities Commission of the State of Colorado. This rule specifies the procedure to be followed by a public utility desiring to change a rate schedule which does not result in an increase in cost to the consumer.[2] The PUC reasoned that the rates approved in Decision C did not increase the cost to the consumer, because such interim rates were less than the rates proposed by Mountain Bell. The higher rates otherwise would have gone into effect by operation of law at the point that an application for rehearing, reargument, or reconsideration of Decision B was filed, because the 210 day suspension period had expired on November 3 without the PUC having made a final decision on these rates.[3]

The League asserts, to the contrary, that Decision C could have been issued properly only under Rule 18 I.A. because the new rates resulted in increased costs to the consumer. The League argues that the rates proposed by Mountain Bell lost all viability when the PUC disapproved them in Decision B and the subsequent filing of a petition for rehearing of Decision B did not serve to resurrect these rates. Accordingly, the interim rates increased the cost to the consumer and Rule 18 I.A. should have been utilized.

---

[2] "18 I.B. *Procedure to Reduce Rates or Amend Rules or Regulations.* When any utility desiring to change a rate schedule, rule or regulation not involving or resulting in an increase in cost to any customer, and unless the Commission otherwise orders, such utility shall give thirty (30) days' notice to the Commission and to the public by filing with the Commission and keeping open for public inspection the proposed tariff changes, stating plainly the change or changes to be made and the proposed effective date."

[3] The PUC follows the policy that a decision is not final for purposes of rate suspension until it has ruled on all applications for rehearing, reargument, or reconsideration which are filed within 20 days after the initial decision is issued.

The difference between Rule 18 I.A. and Rule 18 I.B. is that while 30 days advance notice may be dispensed with under both provisions, Rule 18 I.A. requires the public utility to submit a more detailed explanation of its rate changes and specifies that the PUC can waive 30 days notice only "for good cause shown."

■ We see no merit in the League's position that the PUC's decision rejecting Mountain Bell's proposed rates was final and not subject to a stay. If rehearing procedures are to have any meaning, then an initial PUC rejection of proposed rates should not be considered a final decision until these procedures are exhausted.

■ We do note, however, that regardless of the theoretical contingencies which otherwise would have gone into effect, the practical consequence of Decision C was to increase consumer costs and revenues accruing to Mountain Bell by $11.4 million annually. We believe that, therefore, it would have aided clarity for the PUC to have issued Decision C pursuant to 18 I.A.

If any error was committed, however, it does not warrant reversal. The rates approved in Decision C had been extensively studied and were, indeed, identical to the tariffs authorized in Decision B. We do not regard the differences in issuing the temporary rates under 18 I.A. as opposed to 18 I.B. as particularly significant. We therefore affirm the trial court's judgment as it pertains to Decision C.

The judgments of the trial court are affirmed in part and reversed in part with appropriate remand as set forth in each section of this opinion.

MR. JUSTICE PRINGLE concurs in all respects except that he concurs in the result only in Part IV of the majority opinion.

MR. JUSTICE CARRIGAN does not participate.