ACME DELIVERY SERVICE, INC.,
Plaintiff-Appellee,

v.

CARGO FREIGHT SYSTEMS, INC., a
Colorado corporation,
Defendant-Appellant,

and

The Colorado Public Utilities Commission, Defendant-Appellant.

No. 84SA12.

Supreme Court of Colorado,
En Banc.

Aug. 19, 1985.

William C. Danks, Denver, for plaintiff-appellee Acme Delivery Service, Inc.

Charles J. Kimball, Denver, for defendant-appellant Cargo Freight Systems, Inc.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Mark Bender, Asst. Atty. Gen., Denver, for defendant-appellant Colorado Public Utilities Com'n.

QUINN, Chief Justice.

Appellant Cargo Freight Systems, Inc. (Cargo Freight) appeals from a district court judgment which reversed an order of the Public Utilities Commission (Commission) granting Cargo Freight's application for a Class B contract motor carrier permit.[1] Cargo Freight claims that the district court exceeded the proper scope of judicial review in reversing the Commission's permit decision and that it also erred in determining that the issuance of the permit violated rule 12(b) of the Commission's rules pertaining to private motor vehicle carriers. We agree with Cargo Freight and reverse the judgment.

## I.

A summary of the factual and procedural history of this case will prove helpful to an understanding of our resolution of the issues. For nearly twenty-one years Acme Delivery Service, Inc. (Acme) served The Denver Post newspaper (the Post) as a contract motor carrier and delivered newspapers to distribution centers in the area of Metropolitan Denver. The Post terminated its arrangement with Acme in March 1981 because of poor service and high costs. From approximately August 1981 until September 1982 Den-Col Cartage and Distribution, Inc. (Den-Col) delivered newspapers for the Post. Den-Col performed this

---

1. Appellate jurisdiction lies in this court pursuant to section 40-6-115(5), 17 C.R.S. (1984).

service for the Post pursuant to a Commission order which granted it temporary authority to do so and a subsequent order which extended its authority under an already existing contract carrier permit to include this delivery service. The order of extension stated that it would become null and void in the event Den-Col, which had filed a petition for reorganization in the bankruptcy court, should convert the reorganization petition into a liquidation proceeding.

Den-Col did convert its reorganization petition into a liquidation proceeding and on September 16, 1982, gave notice to the Commission that it no longer had authority under its permit to provide carrier service to the Post. In this same notice Den-Col also stated that Cargo Freight had been formed to provide continued service to the newspaper. Dan Coulter, who had previously served as a dispatcher for Den-Col but was not an officer or shareholder of that company, became the president of Cargo Freight after its formation.[2] The drivers who had previously serviced the Post for Den-Col continued to perform those same functions for Cargo Freight.

On September 16, 1982, Cargo Freight applied to the PUC for emergency authority, temporary authority, and permanent authority to operate as a Class B contract motor carrier[3] for the transportation of newspapers for the Post between various points in the Denver Metropolitan area. The Commission initially granted Cargo Freight emergency authority and temporary authority. On October 4, 1982, Acme filed a protest to Cargo Freight's application, and on April 14, 1983, a hearing was conducted before a hearing examiner. The evidence presented at the hearing detailed the difficulties encountered by the Post under its contract with Acme, the circumstances giving rise to the formation of Cargo Freight, the method of operation utilized by Cargo Freight in servicing the

Post, and Cargo Freight's record of performance since it began operating under the grant of temporary authority. The hearing examiner issued a recommended decision which included the following findings:

... The Denver Post account was handled by [Acme] prior to [Den-Col] providing service. Acme drivers damaged the newspapers and they were soiled with oil or liquid and/or torn. Acme drivers also caused damage to property where the distribution centers were located and were unable to provide the timely service [which] The Denver Post required.

After [Den-Col] began providing service to The Denver Post, The Denver Post also found that the charges incurred were less than those previously charged by [Acme]. This reduction in costs was attributable to the amount of time spent by [Den-Col] ... in providing the same services. The Denver Post has found that the quality of service which it experienced when Den-Col serviced its account has not diminished since [Cargo Freight] began servicing this account. [Cargo Freight] has provided a specialized service for the benefit of The Denver Post.

* * * * * *

[Cargo Freight] owns no equipment but leases its equipment from five individuals.... The owners of the [leased] equipment operate it or hire additional drivers to operate the equipment for [Cargo Freight]. This equipment has been adequate to meet the needs of The Denver Post. [Cargo Freight] showed a profit in its first quarter of 1983 and is able to pay bills when due and satisfy its creditors.... [Cargo Freight] is financially fit, has adequate equipment and personnel, and is otherwise fit to conduct the operations proposed in its request for [permit] authority.

2. In March 1983 Coulter and his wife acquired all of the stock in Cargo Freight.

3. Section 40–11–101(9)(b), 17 C.R.S. (1984), states that "Class B contract carriers embrace all

contract carriers by motor vehicle which do not operate over substantially regular or established routes or between substantially fixed termini."

[Cargo Freight] tailors its services to meet the needs of The Denver Post. Drivers are instructed on the proper procedure to handle the newspapers on behalf of The Denver Post. Most of the drivers deliver their papers to the same destinations. They are familiar with the requirement for timeliness with respect to delivery of the newspapers to the distribution centers. Drivers are also instructed with respect to key service so that they are able to enter distribution centers when locked. [Cargo Freight] also adjusts its operations to deliver the various supplements which are distributed by The Denver Post to the distribution centers throughout the week.... The drivers are provided with manifests that advise them of the quantity and the destination of the papers to be delivered. In the event The Denver Post needs to modify its instructions, it is able to contact Dan D. Coulter who in turn relays the information to the drivers, who generally carry paging devices.

\*　　\*　　\*　　\*　　\*　　\*

[Cargo Freight] does and will continue to provide distinctly superior or unique service for the benefit of The Denver Post, and the granting of this permit will not impair the efficient operation of authorized common carriers operating substantially over the same highways.

Based on these findings, the hearing examiner concluded that it was in the public interest to grant Cargo Freight's application for a Class B contract motor carrier permit and so recommended to the Commission.

Acme filed exceptions to the hearing examiner's recommended decision. Although not specifically referring to Commission rule 12(b), 4 CCR 723–12 (1977), which provided that drivers of vehicles leased to a private carrier "shall bear the relationship of an employee to the carrier," Acme claimed that Cargo Freight was unfit to hold a permit because it had no employees of its own. The Commission on September 20, 1983, denied Acme's exceptions and adopted the recommended decision of the hearing officer. It ruled in pertinent part that "Cargo [Freight] properly leases equipment and maintains appropriate control over the operator of such equipment so that Cargo [Freight] is fit to provide the service as herein requested." Acme then filed an application for reconsideration and expressly claimed that Cargo Freight's failure to use its own employees as drivers of the leased vehicles was a violation of rule 12(b), thus rendering it unfit and unable to serve as a contract motor carrier. The Commission denied Acme's application for reconsideration, ruling that it had waived its argument relative to rule 12(b) by failing to include this specific claim in its exceptions to the hearing officer's proposed decision.

Pursuant to section 40–6–115, 17 C.R.S. (1984), Acme filed a petition for judicial review in the Denver District Court. The court reversed the Commission's decision as arbitrary and capricious for two reasons: (1) the circumstances surrounding the formation of Cargo Freight, in the court's view, rendered that company unfit to hold the permit; and (2) rule 12(b) required the drivers of the vehicles used by the permittee-carrier to be employed by the carrier and, again according to the court, the Commission "in granting the permit violated its own [r]ules."

In seeking reversal of the judgment, Cargo Freight basically argues that the district court exceeded the proper scope of judicial review in reversing the Commission's determination of Cargo Freight's fitness and ability to provide the permitted service and also erred in concluding that the Commission violated rule 12(b) in issuing the permit. We will consider each argument separately.

## II.

■ Turning first to Cargo Freight's argument on the proper scope of judicial review, we point out that a district court's review of the Commission's decision to issue a permit is quite limited. The findings and conclusions of the Commission are presumed to be reasonable and valid and will

not be disturbed if supported by substantial evidence in the record. *Morey v. Public Utilities Commission*, 629 P.2d 1061 (Colo.1981); *Colorado Municipal League v. Public Utilities Commission*, 197 Colo. 106, 591 P.2d 577 (1979). It is peculiarly within the province of the PUC to decide what weight should be accorded the evidence and to choose among any conflicting inferences that may reasonably be drawn from the evidence. *Morey*, 629 P.2d 1061. Evidence in the record must be reviewed in the light most favorable to the Commission's findings and decision. *Morey*, 629 P.2d 1061; *see Peoples Natural Gas Division of Northern Natural Gas Co. v. Public Utilities Commission*, 193 Colo. 421, 567 P.2d 377 (1977). In view of the Commission's special expertise in the matter of public utility regulation, the determination of an applicant's fitness and ability to perform the particular service is the type of decision which is entitled to substantial deference on judicial review. *Miller Brothers, Inc. v. Public Utilities Commission*, 185 Colo. 414, 525 P.2d 443 (1974). While we have not previously categorized the specific factors that are relevant in determining an applicant's fitness and ability to perform under a permit, consideration certainly should be given to the financial status of the applicant as well as the applicant's ability to render the service in an efficient and reliable manner. *See C & H Transportation Co., Inc. v. Interstate Commerce Commission*, 704 F.2d 834 (5th Cir.1983); *Curtis, Inc. v. Interstate Commerce Commission*, 662 F.2d 680 (10th Cir.1981); *Wells Fargo Armored Service Corporation v. Public Utilities Commission*, 190 Colo. 204, 545 P.2d 707 (1976); *Application of Charley's Tour and Transportation, Inc.*, 55 Hawaii 463, 522 P.2d 1272 (1974).

■ Here, the district court reversed the Commission's permit decision because Cargo Freight had come into being as a result of Den-Col's liquidation. In so doing, however, the district court ignored the evidence submitted to the hearing examiner and similarly overlooked the Commission's findings on Cargo Freight's financial fitness and its ability to perform the contract motor carrier service. The evidence submitted to the hearing officer established that Cargo Freight made a profit in the first quarter of 1983 when it operated under a grant of temporary authority. The fact that Cargo Freight leased rather than owned its vehicles was not critical to its financial fitness, especially since vehicular ownership was not mandated by either statute or PUC rule. Furthermore, the evidence quite clearly established that Cargo Freight maintained close control over the drivers and that these drivers had a much better performance record than the drivers of Acme. This evidence clearly supported the Commission's findings relative to Cargo Freight's fitness and ability. Disregard of this evidence by the district court resulted in the impermissible substitution of the court's view of the evidence for that of the Commission.

### III.

■ We now address Cargo Freight's claim that the district court also erred in concluding that the PUC violated rule 12(b) by issuing a permit when the drivers of Cargo Freight's leased vehicles were not employed by Cargo Freight. The Commission declined to consider Acme's claim relating to Cargo Freight's alleged violation of rule 12(b) because Acme failed to specifically refer to the alleged rule violation in its exceptions to the hearing examiner's recommended decision. We believe the Commission's ruling in this respect was unduly restrictive, especially since the Commission's Rules of Practice and Procedure provide that the "[f]ailure to file exceptions to a recommended decision does not preclude any party from filing an application for rehearing, reconsideration, or reargument after the recommended decision has become the decision of the Commission." Rule 15, 4 CCR 723–1 (1977).[4]

4. Moreover, although Acme did not specifically mention rule 12(b) in its exceptions to the hearing examiner's recommended decision, it did obliquely raise rule 12(b) in its closing argu-

Notwithstanding the Commission's failure to explicitly rule on Cargo Freight's compliance with rule 12(b) as raised in Acme's application for reconsideration, a review of the record quite clearly shows that the Commission did consider this issue, albeit implicitly, when it initially determined Cargo Freight's fitness and ability to provide the service encompassed by its permit application. The Commission's determination in this respect finds adequate support in the evidence. We are therefore satisfied that the district court erred in ruling that the issuance of the permit to Cargo Freight was itself a violation of rule 12(b).

■ Rule 12(b), 4 CCR 723–11 (1977) provides in relevant part as follows:

Unless the Commission finds after a hearing that the public interest otherwise requires, no Private Carrier shall, as lessee, lease or rent equipment to be used *under his permit* except in accordance with these Rules.

\* \* \* \* \* \*

(b) Leasing of equipment shall not include the service of a driver or operator. Employment of drivers or operators shall be made on the basis of a contract by which the driver or operator shall bear the relationship of an employee to the carrier. The leasing of equipment or employing of drivers, with compensation on a percentage basis dependent on gross receipts per trip, or for any period of time, is prohibited.

By its own terms rule 12(b) applies only to a private carrier's operations "under permit" and not to its operations under temporary authority. Since Cargo Freight was operating under temporary authority during the period in question, rule 12(b) was technically not applicable to those operations.

■ The fact that rule 12(b) would apply only to Cargo Freight's operations subsequent to the issuance of a permit, however, is not to say that its ability to comply with

the Commission's rule after issuance of a permit should not be a factor in determining its fitness and ability to conduct the service for which a permit is sought. It would be shortsighted, at best, for the Commission to issue a permit without considering whether the issuance might itself place the applicant in violation of the Commission's own rule. In the absence of a waiver of the rule in the public interest, the applicant's ability to conform to the Commission's rules should certainly be a factor bearing on the applicant's fitness to perform service if and when the permit is issued. *C & H Transportation Co., Inc.,* 704 F.2d 834; *Curtis, Inc.,* 662 F.2d 680; *see also Wells Fargo Armored Service Corporation,* 190 Colo. 204, 545 P.2d 707.

■ The record before us adequately demonstrates that the Commission did consider Cargo Freight's ability to comply with rule 12(b) in the course of determining its fitness and ability to provide contract motor carrier service. When the Commission overruled Acme's exceptions to the hearing examiner's recommended decision and adopted that decision as its own, it expressly found that "[Cargo-Freight] properly leases equipment and maintains appropriate control over the operators of such equipment so that [Cargo-Freight] is fit to provide the services as herein requested." This determination was in all respects consistent with the hearing examiner's findings, which in turn were supported by the evidence, that Cargo Freight's president instructed and closely supervised the drivers in the specific details of their work, including such matters as the particular destination, the timing of the deliveries, and the loading and unloading procedures used by the drivers. This type of control rendered the drivers, at the very least, "loaned servants" and thus employees of Cargo Freight for purposes of rule 12(b). *See Kiefer Concrete, Inc. v. Hoffman,* 193

---

ment at the evidentiary phase of the case when it asserted that Cargo Freight was not fit and able to perform the services of the contract carrier. These circumstances, along with the

express mention of the issue in Acme's application for reconsideration, render it appropriate for us to resolve the rule 12(b) issue on the basis of the total record before us.

Colo. 15, 562 P.2d 745 (1977); *Jacobson v. Doan,* 136 Colo. 496, 319 P.2d 975 (1957).

The purpose of rule 12(b), after all, is to ensure that the permittee is actually engaged in and is responsible for the operation of the contract motor carrier service and is not functioning as a mere "permit broker." The degree of control exercised by Cargo Freight over the drivers is compelling evidence that Cargo Freight, not the owners of the leased vehicles, was and would continue to be the actual provider of the contract motor carrier service. We are satisfied, therefore, that the district court erred in concluding that the Commission violated its own rule in granting Cargo Freight's application for a permit.[5]

The judgment is reversed.

**5.** Cargo Freight's president also testified before the hearing examiner that during the period in which Cargo Freight operated under temporary authority he had the authority not only to prohibit a driver from driving due to unsatisfactory performance but also to veto any decision by the lessor concerning the initial assignment of a driver to the Post routes. This testimony, although not specifically referred to in the Commission's decision, provides further support for our determination that the control exercised by Cargo Freight over the drivers of the leased vehicles was such as to satisfy the purpose of rule 12(b).