G & G TRUCKING COMPANY, INC.,
Plaintiff–Appellant,

v.

The PUBLIC UTILITIES COMMISSION OF the STATE OF COLORADO; Ashton Trucking Company; Gibson Truck Lines; and Phillips Trucking Company, Defendants–Appellees.

No. 85SA268.

Supreme Court of Colorado,
En Banc.

Oct. 13, 1987.

As Modified on Denial of
Rehearing Nov. 2, 1987.

**212**

Charles M. Williams, Lakewood, Jean Paul Jones, Alamosa, for plaintiff-appellant.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Valerie McNevin–Peterson, Asst. Atty. Gen., Denver, for defendant-appellee Public Utilities Com'n.

Thomas J. Burke, Denver, for Ashton Trucking Co., Gibson Truck Lines and Phillips Trucking Co., defendants-appellees.

QUINN, Chief Justice.

G & G Trucking, Inc. (G & G) appeals from a judgment of the district court affirming a decision by the Colorado Public Utilities Commission (PUC) that denied G & G's application for clarification or extension of its authority to operate a motor carrier business under a previously issued certificate of public convenience and necessity.[1] Because the PUC's decision is not fatally inconsistent and is supported by substantial evidence in the record, we affirm the judgment of the district court.

I.

Since 1965 G & G has operated a motor carrier business pursuant to a certificate of public convenience and necessity. The certificate authorizes G & G, in pertinent part, to conduct "a transfer, moving and general cartage business in the counties of Alamosa, Saguache, Rio Grande, and Conejos, in the State of Colorado, ... and for occasional service throughout the State of Colorado, and in each of the counties thereof...." G & G's carrier service consists primarily of transporting livestock, petroleum products, and grains, and, to a limited extent, coal, cement, construction equipment, and other commodities.

In 1979 the PUC initiated an enforcement proceeding against G & G to prohibit it from providing transportation services beyond the scope of the occasional authority granted in the certificate. Shortly thereafter, in July of 1979, G & G filed an application with the PUC to obtain a determination as to whether the services it had been providing were beyond the scope of its occasional authority and, if so, for an extension of its occasional authority to provide for those services. G & G's application was protested by Ashton Trucking Company, Gibson Truck Lines, and Phillips Trucking Company. These trucking companies operated a carrier business under a PUC certificate and claimed that the granting of G & G's application would conflict with their certificated authority and would

---

1. Section 40–6–115(5), 17 C.R.S. (1984), provides for appellate review in the supreme court of any final judgment of the district court affirming, setting aside, or modifying any decision of the Public Utilities Commission.

detrimentally affect their operations. The PUC-initiated enforcement proceeding was held in abeyance pending the final outcome of G & G's application for clarification or extension of its authority.

A hearing was conducted by a hearing examiner on G & G's application in March 1980. Documentary evidence admitted at the hearing depicted G & G's operations as being both within and without the authorized four-county area during the 1970s. Various witnesses, most of whom were livestock dealers, testified in support of G & G's application. They stated that there was a present need for these services and claimed that their businesses would be detrimentally affected if G & G were not permitted to conduct its operations on a regular basis outside the four county area.

Evidence presented before the hearing examiner showed that G & G, in attempting to provide a complete service for the four-county area, had conducted operations in and out of the area on a "regular and frequent basis." James Geiser, the manager and part-owner of G & G, testified that he believed such operations were authorized by virtue of G & G's "occasional service" authority in its certificate, were consistent with 1954 and 1955 decisions of the PUC dealing with the "occasional service" authority of other trucking companies, and were also justified by reason of the PUC's failure to take any enforcement action over the years against G & G for its operations outside the four-county area. Geiser admitted on cross-examination, however, that in the late 1960s a PUC enforcement officer had questioned him about G & G's use of its "occasional authority" and had told him to "get it more in line."

Following the hearing on G & G's application, the hearing examiner issued a decision on June 30, 1980, in which he made the following findings: G & G had been providing more than just occasional transportation service outside the four-county area and, in fact, such service was beyond the scope of its certificate; G & G relied in

good faith on a PUC decision which it interpreted as permitting such operations; and there was a public need for G & G to provide this service. The hearing examiner, therefore, recommended that the PUC grant G & G's application for an extension of authority under its certificate.

The three protesting trucking companies (Ashton, Gibson, and Phillips) filed exceptions to the recommended decision, claiming that the evidence presented at the hearing did not demonstrate any public need for G & G's services beyond the occasional service authorized in its certificate. The PUC granted the exceptions and denied G & G's application in its entirety. It expressly found, in pertinent part, as follows: that G & G had been providing more than just occasional service beyond the four-county base area set forth in its certificate; that while G & G allegedly had done so in reliance on 1954 and 1955 decisions of the PUC dealing with the "occasional service" authority of two other trucking companies, the decision of the Colorado Supreme Court in *Public Util. Comm'n v. Watson,* 138 Colo. 108, 330 P.2d 138 (1958), eliminated any possibility that "regular service" could be authorized under "occasional service" authority; that G & G's operations in transporting various commodities on a regular basis between points outside the four county area under its "occasional service" authority were "knowingly done with respect [sic] intent to violate the law," but the evidence "does not establish that such violations were accomplished with a reckless disregard for the law"; and that G & G's unauthorized operations could not be used to establish a public need to extend its authority under its certificate.

G & G sought judicial review in the District Court of Alamosa County. During the course of the district court proceedings, the parties jointly stipulated that the PUC's decision should be reversed and the case remanded to the PUC because of some inconsistent and ambiguous language in some parts of the PUC's decision,[2] and that the PUC should enter a new decision based

---

2. The parties stipulated as follows: that the PUC's decision was internally inconsistent because in Paragraph 17 the PUC found that "G & G's operations were knowingly done with respect [sic] intent to violate the law" but that "the evidence of record herein does not establish that

on the evidentiary record previously made before the hearing examiner. The district court approved the stipulation and remanded the case to the PUC.

Following remand, the PUC entered findings of fact, including the following summary of G & G's intrastate operations within and without the four-county area during various years between 1970 and 1979, based on the total number of loads hauled by G & G during this period:

| Year | Transportation Services Wholly Within the Four Base Counties | Transportation Services Either Into or Out of the Four Base Counties | Transportation Services Wholly Outside the Four Base Counties |
|------|------|------|------|
| 1970 | 13% | 62% | 25% |
| 1971 | 10.77% | 72.21% | 17.02% |
| 1972 | 18.48% | 60.32% | 21.20% |
| 1973 | 21.30% | 53.65% | 25.05% |
| 1977 | 27.71% | 46.93% | 25.36% |
| 1978 | 11% | 75% | 14% |
| 1979 | 9.5% | 76% | 14.5% |

The PUC further found that during this period the PUC staff examined G & G's operations on approximately ten occasions but took no action until the enforcement proceeding was filed in 1977, and that G & G's corporate officers were familiar with the PUC's rules and regulations and would abide by these rules and regulations if G & G's application for extension of authority were to be granted. The PUC then made the following critical determinations:

1. G & G has transported the named commodities on a regular basis between Alamosa, Saguache, Rio Grande and Conejos Counties, State of Colorado, on the one hand, and all points in the State of Colorado, on the other hand.

2. G & G does not have authority under PUC Certificate No. 353 to transport the named commodities on a regular basis between Alamosa, Saguache, Rio Grande and Conejos Counties, State of Colorado, on the one hand, and all points in the State of Colorado, on the other hand.

3. By transporting the named commodities on a regular basis between Alamosa, Saguache, Rio Grande and Conejos Counties, State of Colorado, on the one hand, and all points in the State of Colorado, on the other hand, G & G has conducted unauthorized operations in reckless disregard for the law.

4. G & G's unauthorized operations conducted in reckless disregard for the law cannot be used to establish public need.

5. The competent evidence in this matter is insufficient to support the granting of the extension sought in this application and the public need does not require the granting of the extension sought herein.

6. G & G's alternative request for an extension of its existing authority to allow it to continue its unauthorized operations under its occasional portion of its authority should be denied.

G & G again sought judicial review in the district court, which affirmed the PUC decision, and this appeal followed. G & G

such violations were accomplished with a reckless disregard for the law;" that the PUC erred in interpreting G & G's certificate to prohibit all transportation services between points both of which are outside of the primary area; that the PUC's finding that G & G was seeking "to extend its authority based upon improper service provided wholly between points outside of G & G's base area" was too ambiguous to be reviewed by the district court because it was unclear whether this finding meant (1) that G & G had neither occasional nor regular authority outside its base area, or (2) that G & G's authorized occasional service outside its base area was so regularly provided that it constituted "improper service"; and "that the PUC had erred in stating that prior PUC decisions had held that service between points both of which are outside the base area" is not appropriate or authorized under a grant of "occasional authority."

basically claims that the PUC's decision to deny G & G's application for an extension of authority is fatally inconsistent in several particulars and that, if not inconsistent, it is nonetheless unsupported by substantial evidence in the record.

## II.

Before addressing the merits of G & G's claims, we first summarize those basic principles of public utility law which provide the framework for our analysis.

## A.

■ In order to transport property upon the public highways in Colorado in intrastate commerce, a motor vehicle carrier must first obtain from the PUC a certificate of public convenience and necessity, and, when so certificated, must operate in accordance with the provisions of its certificate. §§ 40–10–104 and –112, 17 C.R.S. (1984). When a motor vehicle carrier is granted "occasional service" authority throughout the state in connection with a certificate to conduct a general cartage business in certain areas of the state, the "occasional service" authority is incidental and secondary to its primary authority under the certificate. In *Public Util. Comm'n v. Watson,* 138 Colo. 108, 330 P.2d 138 (1958), this court addressed whether Watson Transport Company's cement hauling operations from Larimer County to Denver, averaging 100 trips per month, were beyond its certificated authority to conduct a general cartage business in the city of Loveland and the county of Larimer, including "occasional service" authority to operate throughout the state and each of the counties in the state. In holding that Watson's operations exceeded its "occasional service" authority under its PUC certificate, the court stated:

> There is nothing obscure or mysterious about the word "occasional" as used in the certificate of authority issued in 1930 and under which Watson now claims the right to operate. Webster's Unabridged New International Dictionary defines "occasional" as "occurring at irregular intervals; infrequent." Webster's Inter-

collegiate Dictionary defines the word as "occurring now and then; incidental." " * * * the term regular in its ordinary and popular meaning is the clear antonym of 'casual' or 'occasional' * * *." *Palle v. Industrial Commission,* 79 Utah 47, 7 P.(2d) 284. The record before us dispels all doubt that Watson's operations were *regular* and not *occasional.*

*Watson,* 138 Colo. at 113–14, 380 P.2d at 142 (emphasis in original), *see also Englewood Transit Co. v. Public Util. Comm'n,* 167 Colo. 54, 445 P.2d 218 (1968) (reaffirming definition of "occasional service" adopted in *Watson* ). Furthermore, a carrier cannot support an application for an extension of its services on the basis of a public need which the carrier is satisfying through unauthorized operations "with intent to violate the law or with a reckless disregard for the law." *Red Ball Motor Freight v. Public Util. Comm'n,* 185 Colo. 438, 443, 525 P.2d 439, 442 (1974); *see also Miller Bros. v. Public Util. Comm'n,* 185 Colo. 414, 436, 525 P.2d 443, 454 (1974).

## B.

The scope of judicial review of a PUC decision is limited by section 40–6–115(3), 17 C.R.S. (1984), of the Public Utilities Law to a consideration of whether the PUC regularly pursued its authority, whether its decision is just and reasonable, and whether its conclusions are in accordance with the evidence. Since section 40–6–115(3) "does not delineate the particular factors to be considered, or the evidentiary standard to be applied in determining the validity of a PUC decision," it is appropriate to look to the State Administrative Procedure Act for more specific guidelines on these questions. *Home Builders Ass'n v. Public Util. Comm'n,* 720 P.2d 552, 559 (Colo.1986). Section 24–4–106(7), 10 C.R.S. (1982), of the State Administrative Procedure Act provides as follows:

> If the court finds no error, it shall affirm the agency action. If it finds that the agency action is arbitrary or capricious, a denial of statutory right, contrary to constitutional right, power, privilege, or immunity, in excess of statutory jurisdiction, authority, purposes, or limi-

tations, not in accord with the procedures or procedural limitations of this article or as otherwise required by law, an abuse or clearly unwarranted exercise of discretion, based upon findings of fact that are clearly erroneous on the whole record, unsupported by substantial evidence when the record is considered as a whole, or otherwise contrary to law, then the court shall hold unlawful and set aside the agency action.... In making the foregoing determinations, the court shall review the whole record or such portions thereof as may be cited by any party. In all cases under review, the court shall determine all questions of law and interpret the statutory and constitutional provisions involved and shall apply such interpretation to the facts duly found or established.

■■■ The factual determinations of an administrative body such as the PUC are entitled to considerable deference. As long as there is substantial evidence in the record to support the PUC's findings, a reviewing court will not disturb those determinations. *Acme Delivery Serv. v. Cargo Freight Sys.*, 704 P.2d 839 (Colo.1985); *Morey v. Public Util. Comm'n*, 629 P.2d 1061 (Colo.1981); *Mobile Pre-mix Transit, Inc. v. Public Util. Comm'n*, 618 P.2d 663 (Colo.1980). As we have previously noted, "[i]t is peculiarly within the province of the PUC to decide what weight should be accorded the evidence and to choose among any conflicting inferences that may reasonably be drawn from the evidence." *Acme Delivery Serv.*, 704 P.2d at 843 (citing *Morey*, 629 P.2d at 1068). While a PUC decision that is irreconcilably inconsistent in critical particulars cannot be upheld, a reviewing court is obliged to evaluate the record in a light most favorable to the PUC's decision. *See RAM Broadcasting of Colorado, Inc. v. Public Util. Comm'n*, 702 P.2d 746, 750 (Colo.1985); *Acme Delivery Serv.*, 704 P.2d at 843; *Morey*, 629 P.2d at 1068. Hence, any inconsistency that does not affect the basic integrity of the final administrative decision may properly be disregarded. Finally, in view of the PUC's special expertise in utility regulation, substantial deference must be accord-

ed its resolution of issues relating to a carrier's compliance or noncompliance with the terms of its certificate. *See Acme Delivery Serv.*, 704 P.2d at 843; *Red Ball Motor Freight*, 185 Colo. at 443, 525 P.2d at 442.

### III.

We initially address G & G's claim that the PUC's decision is so inconsistent in several particulars as to constitute arbitrary and capricious action and an abuse of discretion. G & G raises three arguments in support of its claim.

First, G & G contends that the PUC's decision is totally at variance with the hearing examiner's recommended decision and is thus fatally infirm. G & G, however, overlooks section 40–6–109(2), 17 C.R.S. (1984), which expressly provides that "[t]he commission may adopt, reject, or modify the findings of fact and conclusions of ... [the] examiner or, after examination of the record of any ... proceeding, enter its decision and order therein without regard to the findings of fact and conclusions of ... [the] examiner." § 40–6–109(2), 17 C.R.S. (1984). Therefore, G & G's claim of inconsistency in this respect is without merit.

■■■ G & G next argues that the PUC's decision is inconsistent because it reaches the same result as its prior decision which, by stipulation of the parties, was remanded by the district court to the PUC due to inconsistent and ambiguous language. The stipulated inconsistency in the PUC's initial decision related to its finding that G & G had knowingly conducted its operations "with respect [sic] intent to violate the law" but had not acted "with a reckless disregard for the law," and the stipulated ambiguity concerned the PUC's discussion of "occasional service" authority under its prior 1954 and 1955 decisions. The inconsistent and ambiguous language, however, was eliminated in the subsequent decision which is under review here. The fact that the two decisions reached the same result is no bar to an affirmance of the decision before us. *See Morey*, 629 P.2d 1061.

■ G & G's third argument is that the PUC's decision is inconsistent because it found that G & G was operating in reckless disregard for the law but also found that G & G would abide by commission rules and regulations in the future. The fact that G & G recklessly disregarded the law in the past does not necessarily mean that it will continue that reckless conduct in the future. We thus reject G & G's arguments as devoid of merit.

### IV.

■ We next consider whether there is substantial evidence in the record to support the determination that G & G provided transportation services beyond the scope of its occasional authority and that its operations were conducted with reckless disregard for the law. We are satisfied that there is substantial evidence to support the PUC's decision.

### A.

The evidence cogently demonstrates that during the 1970s, G & G's regular carrier services within the four-county area varied from a high of 27.71 percent of its total carrier business in 1977 to a low of 9.5 percent in 1979. During the same period, G & G's other carrier business consisting of operations either into or out of the four-county area amounted to a high of 76 percent of its total carrier business in 1979 and a low of 46.93 percent in 1977. Finally, G & G's carrier services wholly outside the four-county base area during the same period fluctuated from a high of 25.36 percent of its total carrier business in 1977 to a low of 14 percent in 1978. During the period of 1970 to 1979, G & G's regular operations accounted for the following percentages of its total carrier business: 1970—13 percent; 1971—10.77 percent; 1972—18.48 percent; 1973—21.30 percent; 1977—27.71 percent; 1978—11 percent; and 1979—9.5 percent. During this same period, G & G conducted the following percentages of its total carrier business under its "occasional service" authority: 1970—87 percent; 1971—89.23 percent; 1972—81.52 percent; 1973—78.70 percent; 1977—72.29

percent; 1978—89 percent; and 1979—90.5 percent. In sum, the evidence irrefutably establishes that, although the major part of G & G's carrier operations were conducted under its "occasional service" authority, these operations were anything but "occasional" as that term was defined in *Watson*, 138 Colo. at 113–14, 330 P.2d at 142. The PUC's decision that G & G was conducting operations not authorized by its certificate is supported by substantial evidence.

### B.

■ There is also substantial evidence to support the PUC's determination that G & G was conducting its unauthorized operations with a reckless disregard for the law. The 1955 PUC decision on which G & G relied in engaging in extensive operations outside the four-county area was the very same decision which this court reviewed in explicating the meaning of "occasional service" authority in *Watson*, 138 Colo. at 113–14, 330 P.2d at 141–43. G & G was not free to pick and choose a meaning of "occasional service" authority suitable to its own ends in total disregard of the meaning placed on that term by this court. In light of this court's decision in *Watson*, we are satisfied that G & G's asserted reliance on the 1954 and 1955 PUC decisions as a warrant for conducting extensive operations outside the four-county area was clearly misplaced.

Furthermore, the evidence shows that the PUC questioned G & G's "occasional service" operations in the late 1960s and told G & G to get those operations "more in line" with the terms of its certificate. G & G disregarded this admonition and during the following ten-year period engaged in a substantial cartage service outside the four-county area. Although the PUC failed to take affirmative action against G & G during this period, that failure did not vest G & G with a grant of authority to engage in operations not authorized by its certificate. *McKenna v. Nigro*, 150 Colo. 335, 339, 372 P.2d 744, 746 (1962).

The judgment of the district court is affirmed.